## WINGATE v. WINGATE.

See this case for a discussion of the statute of limitations, in connection with the subject of trusts and bailments.

Where the vendor of a slave, who retained a life estate, hired the slave to a third person, by contract in writing, at so much per month, "until called for," and shortly afterwards died, it was held that the statute of limitations began, at the death of the vendor, to run against the vendee, in favor of the hirer, although it did not appear that the hirer ever claimed the slave adversely to the vendee, (unless the act of retaining him in his possession, in the absence of a demand, could be considered evidence of such adverse holding.)

Appeal from Polk. Suit brought, October 1st, 1849, by R. P. Wingate, who resided in Mississippi, against E. T. Wingate for a man slave, Boston, of the age of twenty-five years, and of the value of $1000. The petition was in the form of a declaration in trover. General demurrer, plea of the statute of limitations, and general denial; amended by plea of no demand. Amendment to petition, claiming hire under a contract annexed, at the rate of six dollars a month, from

the 8th of April, 1841, and averring a demand on the 5th August, 1847, and refusal to deliver. Second amendment to petition, striking out 1847 in the first amendment and inserting 1848. It was in proof that Walter Wingate, sen'r, had conveyed the slave Boston to R. P. Wingate and J. Wingate, who were his sons, in 1841, reserving the possession and use of the slave during his life time; and that J. Wingate had since released to R. P. Wingate. The following instrument of writing was also in evidence: "I acknowledge to have "received of my father, Walter Wingate, sen'r, his negro boy "Boston, for whose labor I agree to pay him at the rate of six "dollars per month, until called for. Columbia, Louisiana, "8th April, 1841. E. T. WINGATE.

"Test: BOWEN HILL, H. G. MERCER."

Walter Wingate, sen'r, died in 1844, over eighty years of age. The value of the slave was proved. He had been in the possession of the defendant for the last twenty-five years, and was in his possession at the time of the trial. There was no proof of any demand, nor was there any evidence, that the defendant, E. T. Wingate, claimed the slave adversely to the plaintiff, unless the act of retaining him in his possession, in the absence of any demand, constituted evidence of that fact. There was a verdict and judgment for the plaintiff, and the defendant appealed. Several points, not going to the merits, were made by the defendant; but they are omitted, because not noticed by this Court.

*Yoakum & Branch,* for appellant. If the statute did not run before, it began to run in 1844, when the elder Wingate died. All bailments are trusts. So long then as the relation of trustee and *cestui que trust* is acknowledged to exist between the parties, and the trust is continued, the statute does not run. But when this relation is no longer admitted to exist, or time and long acquiescence have obscured the nature and character of the trust, or the acts of the parties, or other circumstances give rise to presumptions unfavorable to its contin-

uance, then the statute runs. (2 Story, Eq., Sec. 1520 a.) What
are the acts of the parties here? Since 1841 defendant has
held and owned the negro. At that time the elder Wingate
severed the relation of trustee and *cestui que trust*, by selling
the boy, reserving a life estate. At his death, in 1844, the
plaintiff had the same right to sue, that he had in 1849. E.
T. Wingate has not admitted this relation to exist, since 1841.
(See 4 Yerg. R. 104; 3 Id. 201 and 435.) If the plaintiff be-
low supposed the relation to exist, he should have "called
for," made a demand for the negro. The instrument as well
as the law, agree in this demand before suit.

The plaintiff seems to have been aware of the necesisty of
a demand before suit, for he avers it in his amended petition :
but finding more than two years elapsed betwen the demand
and suit brought, he amends again, and brings his demand
within two years before suit, yet not a word of this in proof.

While the trust existed between E. T. Wingate and his
father, either of them had a right to destroy it. The father
did so, by selling the negro. As there was no continuance of
the trust by the terms of the sale, it ended at least at the
death of Walter Wingate.


*H. N. & M. M. Potter*, for appellee. The appellant was
clearly the trustee, and the trust has never been determined,
and the statute will not run. An express trust is not barred
by the statute of limitations. (Danforth v. Lang, 3 Hayw. R.
68.) A trustee cannot take advantage of the statute of limita-
tions against the *cestui que trust* or person claiming under
him. (4 Munf. R. 237; 5 Johns. Ch. R. 531; 3 Johns. Ch. R.
216; Id. 390.)

Time begins to run against a trust only from when it is
openly disavowed by the trustee, who insists upon an adverse
right and interest, which is fully and unequivocally made
known to the *cestui qui trust*. (Oliver v. Piatt, 3 How. U.
S. R. 333 and 411). In general, length of time is no bar to

a subsisting trust, established to have once existed. (4 How. U. S. R. 561 ; 1 Id. 135 ; 6 Wheat. R. 481.)

The conveyance from old Walter Wingate to Robert and John Wingate, and from John Wingate to Robert Wingate, appellee, did not terminate or change the relation of Edward Wingate, as trustee ; consequently, the statute of limitations never commenced to run, and the judgment should be affirmed with damages.

LIPSCOMB, J. The plaintiff in the Court below, who is the appellee in this Court, brought suit against the appellant, to recover a negro slave named Boston. The plaintiff claimed title by purchase from his father, Walter Wingate, with a reservation that the father was to retain the use of the slave during his life. The defendant set up the plea of the statute of limitations ; and, to avoid the statute of limitations, the plaintiff offered in evidence, an agreement signed by the defendant, as follows, i. e. " I acknowledge to have received of " my father, Walter Wingate, sen'r, his negro boy Boston, for " whose labor I agree to pay him at the rate of six dollars per " month, until called for. Columbia, Louisiana, 8th April, " 1841.                      E. T. WINGATE.

" Test: BOWEN HILL, H. G. MERCER."

Walter Wingate died in 1844, and this suit was brought on the 1st of October, 1849. To avoid the statute, the plaintiff in the Court below contended that the possession of the defendant was an express trust, that continued until demanded according to the writing or receipt given by the defendant, recited above ; and that the statute did not commence running until the demand was made. This view of the character of the possession of the defendant was sustained by the Court ; and there was a verdict and judgment for the plaintiff, and the defendant appealed.

That the agreement of the son constituted him a trustee for his father, to some extent, is admitted ; because every bailee is, in some sense, a trustee. But it does not follow, that every

54

kind of trust forms an exception to the operation of the statute of limitations ; if so, half the business transactions of men would be removed from its influence. And the doctrine has been settled, by a train of decisions, from the case of Lockey v. Lockey, Prec. in Ch. 518, decided by Lord Macclesfield, down to the present time, that to remove a trust from the operation of the statute, it must be such a trust, technically, as is created by the mutual confidence of the parties, such as equity alone can take cognizance of and afford redress. If it is a trust that Common Law Courts could give relief, the statute will run, although the party may have sought his remedy by a suit in chancery. In such cases, the fact of the suit being brought in the Court of Chancery, will not defeat the statute ; it can be avoided only by a technical trust, of which the Courts of Common Law could afford no relief. When it is laid down that so long as a trust is continuing and subsisting, the statute does not commence to run between the *cestui que trust* or his assigns and their trustee, the doctrine applies to such cases only as are strictly and technically trusts, created and sustained by the principles of equitable jurisprudence, exclusive of, and in contradistinction to, trusts of Common Law cognizance ; and even in such cases the statute would commence to run from the time the trustee disavowed the trust, or did any act conclusively showing that he did not hold as trustee.

If the legal title is in one, in trust for another, the trust could not be enforced, but by a resort to equitable jurisdiction. This would be a case where the trust would be a continued equitable trust ; the statute would not run in favor of the *cestui que trust* or his assigns, until the trustee had clearly avowed that he did not hold as trustee, but in adverse right to the trust claim.

If one man receives into his possession the money or chattels of another, it would create a trust ; but suppose he goes further and writes to the other that he had so received his money, here would be a declaration of a direct trust, but not such a trust as would be unaffected by the statute of limitations ;

because suit could be brought in a Court governed by the rules of the Common Law. It is important in all cases of trust, in inquiring whether the statute can be pleaded, to bear this distinction in the mind: if there is a remedy at law, that is, on the principles of the Common Law, in contradistinction to equity jurisprudence, the fact of there being such remedy brings the trust within the statute.

In Kane v. Bloodgood, 7 Johns. Ch. 8, a case which the late Chancellor Kent has, by the display of his talents and great research, on the subject of the statute of limitations, as a bar to trusts, coupled with the immortality of his own great name, the Chancellor says, " I cannot assent to the proposition that " all cases of direct and express trust, arising between trustee " and *cestui que trust*, are to be withdrawn from the opera-" tion of the statute of limitations, notwithstanding a clear " and certain remedy exists at law. The word trust is often " used in a very broad and comprehensive sense. Every de-" posit is a direct trust. Every person who receives money " to be paid to another, or to be applied to a particular pur-" pose, to which he does not apply it, is a trustee, and may be " sued, either at law for money had and received, or in equity, " as trustee, for a breach of trust. (Willis, Ch. J. in Scott v. " Seaman, Willis, R. 404, 405.) The reciprocal rights and " duties founded upon the various species of bailments and " growing out of those relations, as between hirer and letter " to hire, borrower and lender, depositary and the person de-" positing, a commissioner and an employer, a receiver and " giver in pledge, are all cases of express and direct trust; " and these contracts, as Sir William Jones observes, (Jones " on Bailments, 2,) are among the principal springs and wheels " of civil society. Are all such cases to be taken out of the " statute of limitations, under the notion of a trust, when one " of the parties solicits his remedy in this Court? A re-" view of the decisions will enable us, as I apprehend, to de-" duce from them a safer and sounder doctrine; and to establish " upon the solid foundation of authority and policy, this rule:

" that trusts, intended by Courts of equity not to be reached " or affected by the statute of limitations, are those technical " and continuing trusts, which are not at all cognizable at law, " but fall within the proper, peculiar and exclusive jurisdic- " tion of this Court."

The Chancellor then proceeds to examine closely, but fairly, all the authorities, from the earliest he could find, (Harrison v. Lucas, 1 Cha. Rep. 67, 15 Car. I,) down to the case then before him, and shows that the distinction, laid down by him, could be traced through the whole of them, but that it was not so distinctly and clearly laid down, until the opinion of Lord Macclesfield in the case before cited; that the distinction was, in that case, clearly defined, and has been so acknowledged ever since; that the only exceptions were made by himself, if they really could be regarded as exceptions, in the case of De-couche v. Savetier, 3 Johns. Cha. 216, 217, and in Costa v. Murray, 5 Johns. Cha. 522, in which cases he frankly admits that he had been mislead by some of the earlier decisions in the time of Charles II., on which he had commented, and by the exceedingly loose manner in which the rule as to trusts had been spoken of in the books. See also the opinion of Chief Justice Spencer, in the case of Costa v. Murray, 20 Johns. R. 576, 610.

To apply the principles discussed, to the case before us, it seems to be clear, that the written acknowledgment, relied upon, is not evidence of such a trust as would take it out of the statute of limitations. There is no pretence, but that there was ample remedy on the principles of the Common Law, to the father whilst he lived, and to his assigns after his death, and that if a trust, it was not such a trust as gave " peculiar and exclusive jurisdiction to the Court of equity." There was no legal title in the defendant, that made it neces- sary for the chancery jurisdiction to look behind. The title was acknowledged to be in the elder Wingate, and the defend- ant, the son, had only the possession, and the statute would have commenced running the moment that a right to sue the

defendant, according to the stipulations of the contract, had accrued.

We have, so far, discussed this case upon the assumed ground that it was a trust, on which the relations between the trustee and the *cestui que trust* were discussed, and how far such trusts were to be affected by the statute of limitations. We will now enquire, if the agreement, by the son with the father, did not constitute different relations from that of a confidential one between a trustee and *cestui que trust*—the relation of hirer—and under the Common Law jurisdiction, as a bailment. Judge Story, in discussing the various kinds of bailments, says, " The fifth and last class of bailments consists of bailments for hire. A contract of this sort is called in the Roman Law, *locatio*, or *locatio conductio*, both words being used promiscuously to signify the same thing. In the Roman Law, it may be defined thus : *Locatio conductio est contractus quo de re fruenda vel facienda pro certo pretio convenit*. In other words, it is a contract whereby the use of a thing, or the services or labor of a person are stipulated to be given, for a certain reward. (Story Com. on Bailments, p. 24, Sec. 368, and reference is made to Wood's Institute, B. 3. tit. 15. p. 235, 236.) According to this definition, the agreement signed by the defendant, was evidence of a hiring, for which a certain price was stipulated to be paid, monthly; but it fixed no precise period when this hiring was to terminate.

The same learned author, just quoted, says : " Whether " the contract is dissolved by the death of either party, de- " pends upon the intention of the parties and the rules of law " applicable to contracts in general. When the use is to be " for a specific time, it generally remains in force during that " period. Where it is during pleasure, it is dissolved by the " death of either party." (Id. 275, Sec. 419.) From this authority, it would seem to result, that if the hiring had been for a specific time, which time had not expired at the death of either party, the hiring would continue till the time stipulated had expired. But, in this case, there being no time stipulat-

ed for its continuance, it was dissolved by the death of the elder Wingate. Is such a contract affected by the statute of limitations? We believe that it is; because that it was a contract clearly within the cognizance of a Common Law Court. Now, admitting that the elder Wingate could not sue, because it does not appear that he has done any act in his life time, to determinate the hiring, and he not having claimed the possession of the property so hired, the hiring run on to his death, it was dissolved by his death; then the legal representative or assignee had a right to sue for the property; from which time, (the death of the elder Wingate,) the statute commenced running.

It would not do to regard the contract, in this case, by analogy to a lease for a term of years, as a continued trust. The tenant of a leasehold estate, after the expiration of his tesm, is considered, so long as he continues in possession, as a tenant still, because he had entered as such, and the relation of lord and tenant is not dissolved, and he is not permitted to deny that he so holds. If is thdoctrine should be extended to personal contracts, it would produce the evils deprecated by Chancellor Kent. And besides, we know no exception to the rule that where the right of action accrues, the statute of limitations commences. It could not run during the life of the elder Wingate, because that it does not appear that the hiring had ended, and he could not in his life time have sued, until he had terminated the contract of hiring, by a demand of the property. But, as it has been seen, the plaintiff in the action in the Court below, as assignee, had a right of action the moment the contract of hiring was dissolved by the death of the elder Wingate.

We have examined the case of Oliver v. Piatt, 3 How. U. S. R. 333. It is a long case; too long to be reviewed; but it seems clear that the principles, discussed and decided in that case, are not repugnant but reconcilable with the views of the Chancellor, in Kane v. Bloodgood. It would require great weight of authority to overrule the doctrine of that case.

For the reason we have given, we believe the Court below erred in its judgment in this case, and that for such error the judgment must be reversed and the cause remanded for a new trial in conformity to this decision.

Reversed and remanded.

NOTE.—I was absent, from indisposition, during the first two weeks of the Term at Tyler, within which time the opinion of the Court in Tinnen, Guardian, v. Mebane, 10 Tex. R. 246, was delivered; and I knew nothing of the case, until I read the Report of it, after the above opinion was written and read by me. Had I had the benefit of the able discussion of the question of continued trusts, by the Chief Justice, I certainly would not have considered it at all necessary or even excusable, to have elaborated that question again. LIPSCOMB.