## GREEN vs. COVILLAUD.

*Tenth District Court for Yuba Co., Nov. T.*, 1857.

### CONTRACT TO CONVEY — LIMITATION.

A contract to convey by a "good and sufficient deed," is only an obligation to pass whatever title the party has, and does not justify a demand for "a clear and perfect title."

A demand for the title to be conveyed, coupled with a tender of the balance due of the purchase money within reasonable time, and often afterwards repeated, will excuse what may appear as an unwarrantable delay in bringing an action to enforce rights under the contract.

The statute of limitations in this State does not expressly include in its provisions an action for specific performance of an agreement to convey real property.

A claim to land can never become so stale as to be barred by the statute of limitations when the party is in possession of the land, asserting his right thereto.

The fact that the grantor paid the taxes on the land he agreed to convey, does not of itself, show an abandonment by the grantee.

Where the grantor postpones the performance of the contract, and delays its execution and induces the grantee to acquiesce therein, by representations to him, the grantor cannot set up this delay as a *lache* of the grantee.

The opinion contains a full review of all the facts in the case.

*Lindley & Hatch* and *Bryan & Filkins*, for plaintiff.

*Reardon, Mitchell & Smith*, for defendant.

BARBOUR, J.—This is an action to enforce the specific performance of a contract to convey land. On the 1st day of January, 1851, the defendants, *Charles Covillaud, Jose M. Ramirez, William H. Sampson* and *G. N. Lovejoy*, together with *R. B. Buchanan* (since deceased,) and *C. B. Sampson* (since declared to be of unsound mind,) executed under seal and delivered to the plaintiff, *Isaac Green* and to *J. M. Turney, Ezra Bligh* and *Thomas Elrod*, a bond in the penal sum of six hundred dollars, conditioned for the conveyance of a certain tract of land situated in Yuba county, on the Yuba river, and embraced within the limits of a Mexican grant, the said tract of land containing two hundred and twenty-six (226) acres, more or less. As a consideration for the land, the said *Green et al.*, paid one hundred dollars to their vendory at the time of the execution of the bond, and also made and delivered to them, their joint promissory note for the balance of the purchase money, amounting to six hundred and six dollars, payable the 1st day of October, 1851.

By a mistake, which is evident, there is a discrepancy between the amount stated in the note and that recited in the bond, the latter being for a different amount. At the time of the contract between the parties, the defendant *George G. Briggs*, had a few acres of land enclosed with a fence, and was living upon it, in a small house or camp. He was apprised of the contract between the parties to the bond and note, and knew he was upon the land described in the bond. He was notified by both parties to quit and surrender the possession of the land in his inclosure, and warned not to make any further improvements.

*Green, Turney, Bligh* and *Elrod* went into possession of all the land purchased by them (with the exception of the portion occupied by *Briggs*,) under the bond and with the knowledge and consent of their vendors. They and their successors in interest, have continued in possession ever since, improving and cultivating the land, and claiming title under the bond. The defendant, *Briggs*, has also continued in the possession of that part of the land originally taken by him, and has

gone on to improve the same, contrary to the urgent remonstrances of the other parties.

The *Cordua* grant was confirmed by the U. S. Board of Land Commission on the 27th of March, 1855. Within a few days after the confirmation of the grant, *Green*, claiming an interest in the land under the contract or bond, *made a legal tender* to all the defendants, including *C. B. Sampson*, (who was then in his right mind,) of the whole amount, including principal and interest due upon said promissory note, as described in the bond, and demanded a deed of the land, which was by the defendants refused. Subsequently to this the defendants conveyed to the said *Briggs* so much of the land as was already in his possession.

There is no evidence that the note was ever presented for payment to the makers, or any demand thereof was made. The evidence shows that sometime in the months of January or February, 1852, one of the parties who claimed an interest in the land under the bond, carried money to the said *R. B. Buchanan* and *W. H. Sampson*, and demanded a deed, and at the same time offered to pay the note, and that they, *Buchanan* and *Sampson* told him, that they *could not give a deed* for the reason that they had not then a good title—that their title was in dispute; but that as soon as it was perfected, they would take the money and execute a deed. It is also proven that a few days afterwards the same party saw the defendant, *Covillaud*, and asked him when he intended to give a deed to the land, and that *Covillaud* said, in reply, that they (meaning the ranch owners,) *had determined not to take any money, or to execute any deeds to land until the title was confirmed, and that then they would give a deed to the land.* It is also in proof that one of the parties claiming an interest in the land and bond, sometime in the summer of 1853, went to defendant, *Ramirez*, and offered to pay the amount due on the note, and desired a deed, which was refused, *Ramirez* assigning the same reasons, and remarking that their title would soon be settled, when they would receive the money and make a deed.

This case is similar in some respects, to that of *Brown* v. *Covillaud*, decided by this court a year ago. The decision in that case, predicated upon what I conceive to be good law, was by our supreme court reversed.* Without intending any disrespect or want of confidence in

*6 *Cal.*, 566.

the ability of the learned justices who concurred in the opinion in that case, much less to the memory of the late lamented chief justice, who delivered it, I must be permitted to say, that I regard their decision as in conflict with the settled law—as irreconcilable with the *former opinions* of that court, and as repugnant to the plainest principles of right and justice. I am sure the opinion of the court must have proceeded upon a misapprehension of the facts contained in the record.

The true rule of law in cases like that of *Brown* v. *Covillaud,* and which the court seemed to have overlooked in deciding that case, was very clealy defined by justice HEYDENFELDT ; (in the case of *Gouldin* v. *Buckelew,* 4 *Cal.,* 107. The facts in that case differ in no material respect from the facts in *Brown's* case.) Judge HEYDENFELDT in deciding the case, says : " This case must be decided by a simple solution of the question, what was the vendor's relation to the land after his sale ? According to sound principles of equity, sustained by a long current of decisions, he was the vendor with an equitable lien upon the land for the purchase money, and holding the legal title as a security for the enforcement of his lien, (5 *Porter, p.* 469 ; *Chapman* v. *Chunn.* 5 *Ala.,* (*N. S.*) 397.) The vendor in this case had several remedies : he might have recovered possession of the premises, in which case he could only have held until the rents and profits had paid the purchase money, and then equity would have compelled him to convey to the purchaser. He might have enforced his lien in a court of equity, in which case, if the sale had produced more than the purchase money, the surplus would belong to the vendee. * * * The argument that the length of time which elapsed without payment of the purchase money, demands the inference that the contract had been abandoned, is of no force. It was within the power of the vendor to have rendered the time as short as he chose, by a prompt enforcement of his lien."

It was in conformity with this rule of law so forcibly stated by judge HEYDENFELDT, and concurred in by chief justice MURRAY, that this court decided the case of *Brown* v. *Covillaud,* a case standing upon the same facts disclosed in *Gouldin* v. *Buckelew.* If the decision on appeal in the *Brown* case stands, the doctrine which the learned justice says is " sustained by a long current of decisions," falls to the ground.

But however much I may differ with the supreme court in its conclusions of the law, as announced in the opinion overruling my decision in the *Brown* case, I should feel bound to respect them, as authority in this court, and rule accordingly upon a case in every way similar. This case which I am now considering, is not such a case, although it has many of its features. In that case the plaintiffs, although in possession of the land, under a contract to purchase, suffered near four years to elapse, after the maturity of the note given for the purchase money, before they made a tender of the amount due upon it. As a justification of this long delay, they contended that the defendants had not, during that time, such a title to the land as to enable them to give a " good and sufficient deed ;" that their title consisted in a Mexican grant, which was in litigation, and about which there was much doubt and uncertainty. This they proved ; but the supreme court held, that the words " good and sufficient deed," only referred to the form of the deed, and not to the *interest* intended to be conveyed ; that the defendants only obligated themselves to pass their title, whatever it might be, to the plaintiffs ; and that therefore, the plaintiffs were not justified in postponing the payment of the purchase money, upon the ground the defendants could not give a *clear and perfect title ;* that is to say, that a covenant to make a " good and sufficient" deed, does not imply that the vendor must convey to the purchaser a *complete* and *perfect* title, and under such a contract he might, if he chose, simply *quit claim.* I must contend that the authorities are against this position of the court, but conceding that they are correct in the meaning which they attach to the words " good and sufficient deed," then the objection cannot be taken in the present case, for the offer of plaintiffs to pay the money due on their note within four or five months after its maturity, and again in the summer of 1853, and their repeated demand for the deed, while the defendant's land was in litigation—all show that the plaintiffs were willing to take such title as the defendants had—clouded and embarrassed as it confessedly was, and to run the risk of its confirmation themselves.

But it is contended in this case, that time is so far the essence of the contract, that the plaintiffs having failed to pay their note on the day of its maturity, absolutely forfeited all their rights to a performance of the contract to convey. This is a harsher construction, perhaps, than

Green *vs.* Covillaud.

was ever contended for before upon a similar contract in a court of equity. The supreme court in the case above referred to, say : " That to determine whether time is essential in such cases, we are not to look at the letter of the contract alone, to ascertain the intention of the parties, but to the circumstances under which the contract was made, and to the facts and circumstances which have transpired since its execution." The court, in that case, further say : " That although the bond itself, under which the plaintiffs claim their rights, binds the defendants to make a deed on the payment of the note at its maturity, yet this *language of itself*, would be *insufficient* to establish the fact that the payment of the note at a *precise point of time*, was an essential element in the contract ; that it should be taken with other facts and circumstances to establish the true intention of the paties."

When the intention of the parties is to *control* the question whether time is a necessary and essential ingredient of the contract, how did defendants regard it ? Did they not regard the contract as a good and subsisting one, when four months, and when again, two years after the maturity of the note, the plaintiffs demanded a deed, and offered to pay their note, they, the defendants, refused to take the money, and refused to make a deed ; not objecting to the lapse of time ; not claiming an abandonment of the contract, but excusing themselves upon the ground that they had no title, and satisfying the importunities of the plaintiffs with assurances that their title would soon be settled, and by promises that when it was settled, they would give them a deed ? There was no abandonment of the contract in this. There was from the testimony no intention to hold the plaintiffs to the letter of the bond. But there was an *express acquiescence in the delay* which stamps the character of the contract. 1 *Johns. Ch.*, 370.

The defendants prove in defense to this action, that money was worth four per cent. per month at the time the plaintiff's note became due, and that they made the sale of the land to plaintiffs at a price below its real value, in order to get money to meet their necessities. If this was true, why did they not take the money when it was offered them in January or February, 1852 ? Why refuse it then ? Because the contract was abandoned ? No. They recognized it as valid, and by their acts and declarations expressly waived the time mentioned in the bond for the consummation of the contract.

But it is contended that the plaintiffs' right of action is barred by the statute of limitations. It will be seen by reference to the statute of limitations in this State, that in no one of its provisions does it expressly include an action for specific performance of an agreement to convey real property. The rules prescribing such actions must be sought elsewhere. They are to be deduced from decisions where the extent to which the rights of parties to equitable relief have been affected by their *laches*, has been the subject of adjudication. " The statute of limitations does not operate expressly on suits for specific performance, but lapse of time does, and the length of time is governed by the circumstances of each particular case." 13 *Tex.*, 463.

It is well settled that the statute of limitations never applies where the relation of trustee and *cestui que trust* exists, as in this case, the defendants holding the legal title in trust for the plaintiffs. To take it out of the statute, the trust must be such a one as is created and sustained by the principles of equitable jurisprudence, exclusive of common law cognizance. " If the legal title is in one, in trust for another, the trust cannot be enforced, but by a resort to equitable jurisdiction." 11 *Tex.* 434 ; 7 *Johns. Ch.*, 8, where the rule is settled as to the application of the statute of limitations to such actions as this.

But again : can the statute run against one in possession with an equitable title, under a contract to purchase ? The object of the statute of limitations is to bar neglected and stale demands. Can a claim to land ever become *stale*, when the party is in the actual and notorious possession of it—asserting his right to it every day and hour—having it enclosed, living upon and cultivating it ? Never, with one exception, viz : *Brown* v. *Covillaud.* The statute cannot apply in such cases, for the want of reason in it, and when the reason of the rule ceases, the rule itself ceases.

But let us offer a violent supposition, and say that the statute did apply in cases like this one, even then the plaintiffs, I take it, would be entitled to relief upon the ground of fraud. The evidence shows that they were induced by the representations of the defendants to postpone their right of action. This they did under repeated and solemn assurances, and promises from the defendants, that when the title was confirmed, they would deliver up the note, receive the money and execute a deed. The defendants cannot take advantage of the confidence re-

posed in their promises, and of a delay on the part of the plaintiffs, superinduced by representations which the law must pronounce fraudulent.

It is urged that the defendants have paid the taxes on the land, it having been uniformly assessed to them; and evidence of an abandonment on the part of the plaintiffs is sought to be deduced from this fact. This objection may be answered by the fact that the legal title was still in the defendants. This being the case, the property was properly assessed to them; and it could not, with reason or justice, be required of the plaintiffs to pay the taxes on land to which the defendants were constantly refusing to give them a deed, and assigning as a reason that they themselves had no title, or at least an imperfect title.

It may here be stated that the decision in the case of *Brown* v. *Covillaud* proceeds mainly upon the ground, that there was an *abandonment* of the contract on the part of the plaintiffs. That was the material point in the case on which the decision turned, as will be seen by reference to the opinion. If the facts in that case showed that there was an abandonment of the contract on the part of the plaintiffs, (which I certainly am not willing to concede, unless it is true that a party in possession can be adjudged by mere implication to have abandoned his contract to a piece of land upon which he has resided since the date of its execution, and finally sues to enforce it,) clearly there is nothing in the present case to justify a similar conclusion. On the contrary, all the evidence here goes to show that the plaintiffs have, from the commencement, insisted upon and asserted their rights under the contract.

Upon a full consideration of all the facts and circumstances, as well as the law which I think is applicable thereto, I feel constrained to grant the prayer of the plaintiff's complaint, and shall decree accordingly a specific performance of the contract.