POLLARD v. ALLEN. (No. 656.)

(Court of Civil Appeals of Texas. Amarillo. Oct. 31, 1914. Rehearing Denied Dec. 5, 1914.)

1. LIMITATION OF ACTIONS (§ 102*)—CAUSES OF ACTION BARRED BY LIMITATION — TRUSTS.

Plaintiff claimed that he turned over money to his uncle by having it placed to his uncle's credit in the bank, in which it was deposited at his uncle's request and on his uncle's promise that he would put it on interest for plaintiff, and that plaintiff could have it back any time he wanted it or needed it. *Held* that, assuming that the transaction took place as claimed and that a trust was thereby created, such trust, though a direct or express trust, since it arose from an express agreement of the parties, was not a technical, continuing, and subsisting trust against which limitations would not run.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 494–505; Dec. Dig. § 102.*]

2. LIMITATION OF ACTIONS (§ 87*)—SUSPENSION — ABSENCE FROM STATE — NONRESIDENTS.

The departure from the state of a nonresident, who had been temporarily present in the state, did not suspend the running of limitations against a cause of action against him.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 456–462; Dec. Dig. § 87.*]

3. LIMITATION OF ACTIONS (§ 46*)—ACCRUAL OF CAUSE OF ACTION—OBLIGATIONS PAYABLE ON DEMAND.

Where plaintiff turned over money to his uncle on his uncle's promise to put it in a bank on interest for plaintiff's benefit, and to return it when plaintiff wanted it or needed it, there was an obligation payable on demand, against which limitations ran from the date of the receipt of the money by the uncle, or at least from the expiration of a reasonable time in which to make the agreed deposit.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 240–253; Dec. Dig. § 46.*]

Appeal from District Court, Sherman County; D. B. Hill, Judge.

Action by Frank M. Allen against James T. Pollard, executor. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

John H. H. Stahl, of Stratford, and Goldstein & Miller and Turney & Burges, all of El Paso, for appellant. Tatum & Tatum, of Dalhart, for appellee.

HALL, J. Appellee instituted this suit in the district court of Sherman county against appellant September 28, 1912, to recover the sum of $4,165.50, with interest from September 11, 1907, at 6 per cent. per annum. Plaintiff alleged in substance the death of W. C. Thomas on the 30th day of March, 1912; the qualification of appellant as executor of Thomas' estate; that during the winter of 1905 W. C. Thomas and plaintiff purchased a herd of cattle, paying therefor the aggregate sum of $900; that thereafter plaintiff purchased an additional interest to the extent of $400 from the said Thomas, and that thereafter during the winter of 1905 and 1906 the said W. C. Thomas gave to plaintiff all the interest which was then owned by the said Thomas in the said herd of cattle and delivered possession of the same to him; that during the fall of 1906 the said Thomas purchased 100 calves, which he also gave to plaintiff; that on the 1st day of September, 1907, plaintiff was still the owner and in possession of both herds of cattle, and on or about the 10th day of September he sold the entire lot of cattle for $4,265.50 in cash, which he deposited in the First National Bank of Stratford, Tex., save and except $100 retained for his personal use; "that on or about the 11th day of September, 1907, the said W. C. Thomas, now deceased, stated that if the plaintiff would turn over to him the said sum of $4,165.50 then deposited in the bank aforesaid, he, the said Thomas, could and would put said money out at interest for the use and benefit of this plaintiff, and that this plaintiff could have any or all of said money at any time he requested or demanded the same from the said W. C. Thomas, and at any time he needed or desired the same, but that if he would turn it over to said W. C. Thomas at the time he could and would place it so that it could be drawing interest at all times and would be safe, but that the plaintiff should receive any or all of it back when he needed the same, or when he desired to have the same; that the said W. C. Thomas, now deceased, was an uncle of this plaintiff, and acting upon the said request, and in response to the said statements of the said Thomas, this plaintiff turned over and delivered to the said Thomas the aforesaid sum of $4,165.50, by having the First National Bank of Stratford, Tex., place the said sum of money to the credit of the said W. C. Thomas, in the presence of the said W. C. Thomas, for the uses hereinafter set forth." Appellee further alleged that none of said money had ever been repaid to him; that after the said Thomas died in the state of Missouri, on or about the 30th day of March, 1912, plaintiff on or about the 23d day of September, 1912, presented his claim against the estate of the said Thomas, duly verified, to defendant Pollard, as executor of said estate, and that the same had neither been rejected nor allowed.

On January 12, 1914, the appellant filed

his second original answer, in which he demurred generally and specially to plaintiff's amended petition, on the ground that it was barred by the 2 and 4 year statutes of limitations. He denied every issuable fact pleaded by appellee, and averred that the cattle belonged to Thomas at the time they were sold; that the money derived from the sale belonged to Thomas, but that Allen had collected the same, and in transferring it from his account in the bank to Thomas' account he did so in recognition of Thomas' ownership thereof He also specially pleaded the statutes of limitations of 2 and 4 years in bar of plaintiff's right to recover.

In reply to the second amended original answer, appellee filed his first supplemental petition, in which he pleaded the absence of Thomas from the state of Texas from the time of the alleged payment of the money to him until his death, except for a period of about 2 weeks, and that by reason of the absence of the said Thomas from the state of Texas the statutes of limitations did not run, except for about 2 weeks, during which time Thomas was in the state. In response to this supplemental petition, appellant filed his first supplemental answer, in which he denied that Thomas was ever a resident of the state of Texas, temporarily or otherwise, but that for 60 or 70 years before his death he resided continuously in the state of Missouri, and not elsewhere.

The case was submitted upon the following special issues in substance:

First. "Was the $4,165.50 the property of Allen on or about September 11, 1907?" To which the jury answered, "Yes."

Second. "Was it the agreement and understanding between Allen and Thomas that Thomas would keep this sum for Allen, and return same to him when called upon or requested to do so by Allen?" To which the jury answered, "Yes."

Third. "Has Thomas, or any one for him, ever returned the $4,165.50 or any part thereof, to Allen? If so, what amount?" To which the jury answered, "Yes; $1,000."

After the jury had retired, they returned and propounded to the court the following question:

"If we answer special issue No. 1 'Yes,' have we the privilege to deduct from the $4,165.50 the $1,000 that Allen received?"

In reply to this question the court instructed them as follows:

"You will simply answer special issue No. 1, referred to, to 'Yes' or 'No,' as from the evidence before you you find the facts to be, and for further instructions you are referred to the instructions heretofore given you."

Upon motion of appellee the court entered judgment in his favor for the sum of $3,165.-50, and all costs.

[1] The undisputed evidence shows that Thomas was never a resident of the state of Texas, at least since 1906; that he was never in the state but once since the alleged delivery of the money by Allen to him, and at that time he merely passed through on his way to Mexico. From the record it is clear that appellee's cause of action was barred

unless the relation of trustee and cestui que trust existed between Thomas and Allen, under an agreement creating a technical continuing trust. The testimony bearing upon this issue is solely from the witness Allen, and is as follows:

"I had no understanding or agreement with him [Thomas] about this money until after they [the cattle] were sold. I put the money in the bank here, and he asked me to take it to Missouri. He said, 'Frank, I will take this money to Missouri and put it in the bank on interest for you.' I said, 'All right,' and let him have it. He said I could have it any time I wanted it, or needed it. I did not need it. I have not gotten any of that money back. * * * The last time I saw Mr. Thomas was in the fall of 1908, in California, Mo., at which time we talked about the money I let him have at his home. He said he had that money out on interest up there for me, and that I could have it if I wanted it, then or any other time, just like he had always stated."

On cross-examination:

"I have not a scratch of a pen to show that Mr. Thomas owes me any money only the bank books. I have never asked him to repay that money from the time I let him have it until he died. I didn't think it was necessary. I asked him about the interest once. In 1908 I talked to him about it. I never asked about paying interest—never asked about repaying any part of the money. The only time I had any talk with him with reference to it was in 1908, at his home, from the time I let him have it. I do not know whether it was in September or October, 1908, that I was at his home. He lived four years from September, 1908, and during all that time I never as much as chirped about this money to him; I did not need it; I didn't say a word to him about it one way or other. I didn't know how much interest it was bearing; if it was bearing any, I never asked him. I claim to have $4,000 that was to be kept on interest, and never inquired whether it was bearing interest. I never asked who it was loaned to. I did not know where it was loaned. I didn't think it was necessary, for the five years I claim to have had this money loaned, to know how much interest it was bearing, or whether it was loaned out, or to whom. For five years I claim this money was loaned out. I didn't know how much interest it was bearing, or whether it was loaned out, or to whom. It is true that not until after this old man died did I begin to agitate this question. * * * Nobody was present when I talked to Mr. Thomas about this money. I talked to him in the yard; nobody was present. * * * I have alleged, it is true, that Mr. Thomas requested me to turn over the $4,165.50 to him, and that he would put said money out at interest for my use and benefit, and that I could have all or any of the money at any time. I testified in my direct examination that Mr. Thomas told me that he would put it in the bank for me on interest. His agreement was that he was to take it back to Missouri and deposit it on interest in the bank for me. Nothing was said about it being subject to my check. He said I could draw on him any time I wanted money. Nothing was said about checking on the account. The agreement was that he was to take it back and deposit it on interest for me in the bank. He may have done that for all I know. I asked Mr. Pollard for a settlement; for all I know, that money is deposited in the bank on interest for me to-day. When he stated he was going to take the money back to Missouri and deposit it in a bank on interest for me, nothing was said about what bank. I naturally thought it would be a bank in Cali-

fornia, Mo. He said he was going to take it home, and California, Mo., was his home. Our agreement was that he was to deposit it on interest in the bank at California, Mo. I do not know that it is not still there on interest for me; for all I know, it may be on interest for me to-day; for all I know, Mr. Thomas may have done the very thing that I claim he agreed to do. Nothing was said about the money being subject to my check when it was deposited in the bank in Missouri. He said to draw on him if I needed it. He said he would deposit the money, and I could draw on him when I needed it. I may have answered the sixth interrogatory in my deposition (if it reads that way), that he was going to Missouri and suggested to me that he would take this money to Missouri with him and place it on deposit there for me. I didn't loan him the money, but simply placed it to his credit in the bank, in order that he might take it to Missouri, where he said he would place it to my credit on interest, so that I could draw on it any time that I wanted to. My answer to the sixth interrogatory means practically the same thing as what I now say. Under my conception of the truth, both statements are true. I say I didn't loan the money to him. In answer to the fourth interrogatory of my deposition, my answer is: 'I was in Texas at the time I loaned it to him in cash.' That was not correct. I swore two or three times that it was not a loan, and he knows it. I didn't say in one place that it was a loan; he took it down that way. I told him I would not swear it was a loan. My signature is to the deposition. I signed the papers. I told him it was not a loan; told him five or six times during the deposition, and he said it was all right."

We think the rights of the parties to this litigation must necessarily turn upon the construction of the contract detailed by Allen. In Eborn v. Zimpelman, 47 Tex. 503, 26 Am. Rep. 315, our Supreme Court construed two instruments in writing of substantially the same tenor as the agreement between Allen and Thomas, as shown by the above-quoted testimony. The instruments upon which the Eborn Case was founded are as follows:

"Borrowed and received from William Eborn $900.00, which I promise to return when called for, with interest. Feb. 3, 1846. [Signed] Thomas Eborn.

"Received of William Eborn $6,500.00, which I promise to invest in lands, or return the same when called for, with interest. May 14, 1846. [Signed] Thomas Eborn."

Zimpelman, as administrator, pleaded the defense of limitation, and Associate Justice Gould, delivering the opinion of the court, said:

"The claim as presented was a money demand, barred upon its face. The $900 borrowed, to be returned 'when called for,' 'created a cause of action from its date, and against it the statute runs from that time.' Cook v. Cook, 19 Tex. 436. The receipt, or second instrument, is like the receipt which was before the court in Mitchell v. McLemore, 9 Tex. 151. In that case the receipt was for money to be invested in paying government fees for Texas scrip, placed in the party's hands for location, and it was held that if, after the lapse of a reasonable time, the agent had failed to apply the money as required, he was in default, and the statute commenced to run without demand. It was held, further, that even if a demand was necessary 'the plaintiff should have made it within time to have brought his suit before the statute had interposed a bar from the time

the default occurred.' After the lapse of a reasonable time to invest in lands, the money became due without demand; and even if demand were necessary, four years, the ordinary period of limitation to suits on written instruments, was long enough to allow for its being made. Regarding Mitchell v. McLemore as a case in point, and following that case and Wingate v. Wingate, 11 Tex. 430, we hold that the claim as presented, and as sued on, was not an express trust, but was an ordinary moneyed demand, barred by limitation, unless there was a sufficient acknowledgment to support the action."

Conceding that the testimony of appellee, Allen, shows an express or direct trust, still we think it must be classed with those trusts to which our courts have held a plea of limitation applies. Granting that the jury's finding upon the second special issue evinces an express trust rather than a loan, yet it is not such a trust as falls "within the proper, peculiar, and exclusive jurisdiction of courts of equity," but is cognizable at law. The case of Wingate v. Wingate, supra, is in point. R. P. Wingate sued his brother for the possession of a slave. The defendant set up limitations, and to avoid this plea the plaintiff offered in evidence a writing as follows:

"I acknowledge to have received of my father, Walter Wingate, Sr., his negro boy Boston, for whose labor I agree to pay him at the rate of $6.00 per month, until called for. Columbia, La., April 8, 1841. [Signed] E. T. Wingate."

Wingate, Sr., died in 1844, and the suit was filed in 1849. The trial court sustained the plea of limitation, holding that the written receipt created an express trust, which continued until demand. Lipscomb, Justice, reversed the judgment, saying:

"That the agreement of the son (A. T. Wingate) constituted him a trustee for his father, to some extent, is admitted, because every bailee is, in some sense, a trustee; but it does not follow that every kind of trust forms an exception to the operation of the statute of limitations. If so, half the business transactions of men would be removed from its influence; and the doctrine has been settled, by a train of decisions from the case of Lockey v. Lockey, Prec. in Ch. 518, decided by Lord Macclesfield, down to the present time, that to remove a trust from the operation of the statute, it must be such a trust, technically, as is created by the mutual confidence of the parties, such as equity alone can take cognizance of and afford redress. If it is a trust that common-law courts could give relief, the statute will run, although the party may have sought his remedy by a suit in chancery. In such cases, the fact of the suit being brought in the court of chancery, will not defeat the statute. It can be avoided only by a technical trust, of which the courts of common law could afford no relief. When it is laid down that, so long as a trust is continuing and subsisting, the statute does not commence to run between the cestui que trust or his assigns and their trustee, the doctrine applies to such cases only as are strictly and technically trusts created and sustained by the principles of equitable jurisprudence, exclusive of and in contradistinction to trusts of common-law cognizance; and even in such cases the statute would commence to run from the time the trustee disavowed the trust, or did any act conclusively showing that he did not hold as trustee. If

the legal title is in one in trust for another, the trust could not be enforced but by a resort to equitable jurisdiction. This would be a case where the trust would be a continued equitable trust. The statute would not run in favor of the cestui que trust or his assigns, until the trustee had clearly avowed that he did not hold as trustee, but in adverse right to the trust claim. If one man receives into his possession the money or chattels of another, it would create a trust; but suppose he goes further, and writes to the other that he had so received his money. Here would be a declaration of a direct trust, but not such a trust as would be unaffected by the statute of limitations, because suit could be brought in a court governed by the rules of the common law. It is important in all cases of trust, in inquiring whether the statute can be pleaded, to bear this distinction in the mind: If there is a remedy at law, that is, on the principles of the common law, in contradistinction to equity jurisprudence, the fact of there being such remedy brings the trust within the statute. In Kane v. Bloodgood, 7 Johns. Ch. (N. Y.) 90, 11 Am. Dec. 417, a case which the late Chancellor Kent has, by the display of his talents and great research on the subject of the statute of limitations as a bar to trusts, coupled with the immortality of his own great name, the Chancellor says: 'I cannot assent to the proposition that all cases of direct and express trust, arising between trustee and cestui que trust, are to be withdrawn from the operation of the statute of limitations, notwithstanding a clear and certain remedy exists at law. The word "trust" is often used in a very broad and comprehensive sense. Every deposit is a direct trust. Every person who receives money to be paid to another, or to be applied to a particular purpose, to which he does not apply it, is a trustee, and may be sued, either at law for money had and received, or in equity as trustee, for a breach of trust. Willes, C. J., in Scott v. Swoman, Willes, 404, 405. The reciprocal rights and duties founded upon the various species of bailments and growing out of those relations, as between hirer and letter to hire, borrower and lender, depositary and the person depositing, a commissioner and an employer, a receiver and giver in pledge, are all cases of express and direct trust; and these contracts, as Sir William Jones observes (Jones on Bailments, 2), are among the principal springs and wheels of civil society. Are all such cases to be taken out of the statute of limitations, under the motion of a trust, when one of the parties solicits his remedy in this court? A review of the decisions will enable us, as I apprehend, to deduce from them a safer and sounder doctrine, and to establish upon the solid foundation of authority and policy this rule: That trusts, intended by courts of equity not to be reached or affected by the statute of limitations, are those technical and continuing trusts which are not at all cognizable at law, but fall within the proper, peculiar, and exclusive jurisdiction of this court.'"

Judge Lipscomb then applies the principles announced to the facts and holds that the written acknowledgment relied upon is not evidence of such a trust as takes it out of the statute of limitation and continues, using the following language:

"There is no pretense but that there was ample remedy on the principles of the common law, to the father whilst he lived, and to his assigns after his death, and that, if a trust it was not such a trust, as gave 'peculiar and exclusive jurisdiction to the court of equity.' There was no legal title in the defendant that made it necessary for the chancery jurisdiction to look behind. The title was acknowledged to be in the elder Wingate, and the defendant, the son, had only the possession, and the statute would have commenced the moment that a right to sue the defendant, according to stipulations of the contract, had accrued."

In a note appended to this case Judge Lipscomb refers to the case of Tinnen v. Mebane, 10 Tex. 246, 60 Am. Dec. 205, saying it had been decided while he was absent, and that if he had seen it before writing the opinion in the Wingate Case he would not have considered it at all necessary to again discuss the question of continued trusts. In the Tinnen Case, supra, Chief Justice Hemphill says:

"The rule that trusts are not affected by statutes of limitation was in the earlier cases very loosely expressed, and gave rise to erroneous decisions. Chancellor Kent, having been misled by them in the case of Coster v. Murray, 5 Johns. Ch. [N. Y.] 522, examined the subject very elaborately in the case of Kane v. Bloodgood, 7 Johns. Ch. [(N. Y.) 90, 11 Am. Dec. 417], and in a review of the cases, laid down the rule that trusts, not affected by statutes of limitation are those technical and continuing trusts not at all cognizable at law, but which fall within the peculiar and exclusive jurisdiction of courts of equity. * * * All trusts which are cognizable at law are not withdrawn from the operation of the statute. Persons who receive money to be paid to another, or who misapply money placed in their hands for a particular purpose, or the reciprocal rights and duties founded upon the various species of bailments, as between hirer and letter to hire, * * * depositary and persons depositing, etc., are cases of express and direct trusts, but being cognizable at law, or within the reach of the statute. The subject has been so much discussed that, he states, where there is a separate chancery jurisdiction and statutes of limitation are restricted to actions at law, the rule is of easy application. All implied and constructive trusts, all which are cognizable at law, are subject to the bar of limitation; and equity applies the same limitation to equitable demands that is applied in analogous cases at law. It is only where the trust is the mere creature of equity, exclusively cognizable within that jurisdiction, and is a subsisting, continued, and acknowledged trust, that the statute has no operation. It is more difficult, in our system of procedure, to apply the rule. The chancery and common-law jurisdiction are here blended. The doctrine that the trust must be exclusively within the jurisdiction of equity to save it from the statute has very little application in a system of jurisprudence where there is no exclusive equity jurisdiction, and where the statute applies to all subjects within its provisions, irrespective of whether they involve legal or equitable rights, and whether elsewhere they be cognizable at law or in equity. No doubt, with us, the statute extends to all cases in which it is admitted to be applicable in other common law states. How much more it may embrace has not been determined. That portion of the rule which requires the trust, not barrable by time, to be subsisting, continued, and acknowledged, is of more universal application; and, in all cases which come properly within the definition, and are not repugnant to either the express provisions or policy of the statute, there is no doubt that lapse of time would not be permitted to operate as a bar."

The facts in the case of Phillips v. Holman, 26 Tex. 277, show that Phillips transferred to Holman certain shares of stock which Holman agreed to use "as in his judgment would

make it most profitable or productive." The profits were to be divided equally between them. The suit was against Holman, who, it was alleged, had disposed of the stock at a profit of $2,150. The statute of limitations of four years was pleaded as a defense. Bell, Justice, said:

"The only questions which we deem it necessary to discuss in this case, arise upon the plea of the statute of limitations. We do not think that the contract between the parties created in Holman that kind of 'technical and continuing trust' which cannot be affected by the statute of limitations. It is true the contract did not contemplate any particular period of time within which it was to be performed; but it nevertheless implied that it should be performed within a reasonable time, and devolved upon Holman the obligation after the lapse of a reasonable time to account to Phillips upon the contract. The time when the statute of limitations would begin to run upon this contract would perhaps be when Phillips would be entitled to call upon Holman for an account, and to enforce an account. This right would arise in Phillips, either because a reasonable time had elapsed for Holman to have performed the contract by disposing of the certificates of stock which were placed in his hands, or because he had in fact made some disposition of the stock, of which Phillips became informed."

Without quoting from the authorities further, this rule is further elucidated in Bridgens v. West, 35 Tex. Civ. App. 277, 80 S. W. 419; Hightower v. Hester, 15 S. W. 415; Kennedy v. Baker, 59 Tex. 154; Cone v. Dunham, 59 Conn. 145, 20 Atl. 311, 8 L. R. A. 650, and note; Philips v. State ex rel. Harter, 5 Ohio St. 122, 64 Am. Dec. 636; Miles v. Thorne, 38 Cal. 335, 99 Am. Dec. 391.

[2, 3] The temporary presence of Thomas, who is clearly shown by the evidence of Allen to have been a nonresident, did not suspend the statute on his subsequent departure from the state. Wilson v. Daggett, 88 Tex. 375, 31 S. W. 618, 53 Am. St. Rep. 766. Thomas having undertaken to repay the money to Allen when he wanted it makes it an obligation payable on demand. Pitschki v. Anderson, 49 Tex. 1; Kampmann v. Williams, 70 Tex. 568, 8 S. W. 310; Swift v. Trotti, 52 Tex. 503. These cases hold in effect that limitation runs from the date of the receipt of the money by Thomas. However, if it be contended that limitation did not begin to run until after the money had been deposited in a bank for Allen, under the rule, Thomas would be granted a reasonable time in which to make a deposit, and limitation would begin to run at the expiration of that time. The uncontradicted evidence shows that one day was a reasonable time in which to make the deposit.

Perry on Trusts, § 23, announces the rule that private trusts which concern individuals are limited in their duration. All kinds of bailments and deposits come within the jurisdiction of the law. These are in effect personal trusts, with which equity does not deal. Simkins on Equity, 146.

If the transaction in question created a trust, it, of course, was a direct or express trust, since it arose from express agreement of the parties; but the authorities quoted warrant us in holding that it was not such a technical, continuing, and subsisting trust as would exempt it from the bar of the statute.

Appellant urges that the court should have directed a verdict, based upon the answer of the jury to the second special issue, and we are inclined to the opinion that this contention is sound. However, we have thought it best to detail the evidence and quote at length from the authorities applicable to the facts.

We conclude that the judgment must be reversed, and here rendered for the appellant.

Reversed and rendered.