JOHN HUNTER AND OTHERS v. THOS. P. HUBBARD AND ANOTHER.

J. H. and S. B., partners, made an assignment of their partnership assets to G. K. H., to secure him as indorser on their paper. On the same day J. H., to more effectually secure G. K. H., executed a deed of trust on his individual property. In a suit by the trustee, in which the beneficiary was made a party, to subject the trust property to the debts paid by the beneficiary as indorser, J. H. and J. B. pleaded that G. K. H. had been over-paid by J. H., out of his individual means, and that there was a balance due him as well as the firm, for which they asked judgment; *held,* that it was perfectly legitimate that G. K. H. should present his side of the private accounts, and should show, if he was able to do so, that the payments made by J. H. were in satisfaction of other debts than those on account of which the suit was brought.

Where irrelevant testimony has been improperly admitted, if it can in no manner affect the result of the suit, it will be regarded as an immaterial error.

In the above stated case, where the deed of trust provided that in the event the assets so assigned were insufficient to save the assignee from his liabilities as indorser, after the expiration of eighteen months the trustee was authorized to sell the trust property and apply the proceeds to the satisfaction of the debts for which he was liable; the assignors had the right, by proper pleadings, to require the assignee to render an account showing the manner in which he had disposed of the assets so assigned, and that he had made a proper appropriation of the same, as a condition precedent to his enforcing a sale of the trust property; but having failed to do so and gone to trial, it is then too late to object that the assignee had failed to render such an account.

The admissions of one partner with reference to the business of the firm, made subsequent to the date of an assignment of their assets, are admissible in evidence in a suit against all the members of the firm where they have pleaded that they are still partners as to all matters of a firm nature.

Where the plaintiffs alleged that the clerk of a firm was a secret partner, and his depositions were read by the defendants in evidence in a suit against the firm, held that the court did not err in leaving to the jury to determine, as a question of fact, whether the clerk was a secret partner in the firm; and if so, to disregard his testimony.

The court may well decline to consider objections which are manifestly contradictory and incompatible. Emmons v. Oldham, 12 Tex. R., 18, cited and approved on this point.

As to express trusts, it has universally been held that the statute of limitation, as a general rule, has no application. The statute does not begin

to run in favor of the trustee so long as the trust continues, and is acknowledged to be a continuing, subsisting trust, for the reason that the possession of the trustee is the possession of the *cestui que trust;* but if the trustee claim to hold the trust fund as his own and adversely to the *cestui que trust,* and the latter has knowledge of such adverse holding, then from the time of such adverse holding, the statute will run in favor of the trustee.

When the trust is merely implied, or constructive, there has been some disagreement among the cases as to when the statute of limitations commenced running in favor of the trustee, but the better opinion seems to be, that as in general the facts out of which such trust arises, from their very nature, presuppose an adverse claim of right on the part of the trustee by implication from the beginning, the statute will commence to run against the *cestui que trust* from the period at which he could have vindicated his right by action, or otherwise.

If the statute of limitation has commenced to run against a trustee in favor of a grantor in trust, the trustee need not demand the trust property of the grantor, or his assignee, as a condition precedent to his suing for the recovery of the trust property.

Two years bar the right of a trustee to recover personal property from a purchaser, who purchased from the grantor in the trust while in possession, with a knowledge of the trust lien, and holds adversely to the trustee.

Quacre: Whether in case of an absolute sale of personal property by a mortgagor, and a change of possession within the knowledge of the mortgagee, the statute will commence to run against the mortgagee unless knowledge is brought home to him that the purchaser is claiming adversely? or whether, until this is done, he may rely upon the presumption that he has purchased and holds subject to the mortgage? or whether he must, at his peril, take notice of the change of possession of personal property, are questions not authoritatively determined?

See the opinion in this case, in which the application of the statute of limitation to trusts is discussed and authorities cited.

APPEAL from Fayette. Tried below before the Hon. James H. Bell.

John Hunter and Samuel Benton, merchants in Marshall county, Mississippi, using the firm name of Hunter & Benton, on the 5th day of November, 1851, made to Green K. Hubbard an assignment of all debts due the firm, by notes, open accounts, or otherwise, for the purpose of securing him against his liabilities for them as endorser, or surety, on certain bills of exchange, amounting to some twelve thousand dollars, payable to several

parties.   Hubbard, after paying off and discharging said liabilities, was authorized to discharge, with any surplus that might come into his hands, any other debts of said firm, and to facilitate the objects of the assignment, was further authorized to take charge of the books, notes, and accounts of the firm.

To more effectually secure Green K. Hubbard harmless from said liabilities, John Hunter, on the same day, executed a deed of trust to Thomas P. Hubbard, on nineteen negroes and their increase; also, on certain other personal property, as wagons, mules and horses, conditioned, that if the said assignment proved insufficient to secure and save the said Green K. Hubbard harmless, at the expiration of eighteen months; then Thomas P. Hubbard was to expose for sale, after giving sixty days notice, the property, or a sufficiency to secure the said Green K. Hubbard.   It was further provided, that John Hunter should be permitted to remove the said property without the limits of Mississippi, and have the use and service of the same without hindrance or molestation from Thomas P. Hubbard.

John Hunter removed the negroes to Texas, sold them to Henry H. Hunter, and executed a bill of sale for the same, dated September 2d, 1852.   H. H. Hunter sold three of the negroes to John Whittenburg, and made a bill of sale therefor, dated February 14, 1855.   He also sold John G. Sergeant five of the negroes and made a bill of sale therefor, dated February 12th, 1855.   Sergeant sold one of the negroes, thus purchased, to Isaac Morrow, and made a bill of sale for the same, dated January 11, 1856. On the 28th day of August, 1856, Thomas P. Hubbard, as trustee, brought suit in the District Court of Fayette county, Texas, to subject the negroes in possession of Whittenburg, Sergeant and Morrow, to the trust deeed, making them and John Hunter parties defendant.

On the 21st November, 1856, defendants answered and pleaded that Green K. Hubbard had received ample assets of the firm of Hunter and Benton to discharge the liabilities; that he had in fact, out of the assets of said firm, paid off and discharged all of the claims upon which he was liable as indorser, or surety; indeed, he had received assets more than sufficient for that purpose, and

was indebted to the said firm and to John Hunter for money remaining in his hands. They further pleaded the two and four years limitations.

On the 19th day of May, 1857, John Hunter and Samuel Benton intervened and averred that Green K. Hubbard had, out of the assets of the firm assigned, paid a portion of the claims; that the balance had been paid; that he had paid no part out of his own means; that he had diverted a large portion of the assets assigned to his own use, in payment of claims against himself and his relatives; that they had by mistake paid him eight thousand dollars; that Green K. Hubbard was individually indebted to said firm in a large sum for articles sold to him; that he had failed to use due diligence in collecting the debts and assets assigned, whereby a large amount had been lost to defendants; and they reconvened and asked judgment against Thomas P. and Green K. Hubbard for fourteen thousand one hundred and thirty-two dollars and ninety-two cents. The account of Green K. Hubbard with Hunter and Benton for that amount was filed as an exhibit. On the same day John Hunter for himself filed an answer, adopting the plea of intervention filed by Hunter and Benton, and averring that being deceived by the false representations of Green K. Hubbard, he had consented to the payment of the eight thousand dollars, and that he himself had paid Green K. Hubbard large amounts, filed an account against him as an exhibit, showing a balance against G. K. Hubbard of two thousand six hundred and ninety-two dollars and eighty-two cents. By further amendment, intervenors alleged that the books, notes and accounts of Hunter and Benton were placed in the hands of Green K. Hubbard, under the assignment; that he failed to use due diligence in the collection of debts due the firm; diverted the assets to his own private purposes; by his negligence in collection of debts, large sums of money were lost to intervenors, and prayed that he be compelled to account.

Green K. Hubbard, being made a party to the proceedings, answered denying all the allegations of the answers of defendants and of the plea of interventions, and specially denying that the books and accounts of Hunter and Benton were placed in his

hands, but alleging on the contrary that they were put in the hands of Jacob B. Hunter, who was the son of John Hunter, and a dormant partner of Hunter and Benton; and as a set-off to the account of John Hunter against him, he set up an individual account against John Hunter for services rendered. The defendants excepted specially to that part of the answer of Green K. Hubbard setting up a special indebtedness of John Hunter. The plaintiffs also specially excepted to the individual indebtedness of Green K. Hubbard to John Hunter, as foreign to the suit.

The defendants, Whittenburg, Sergeant and Morrow, specially answered, adopting the answers of Hunter and Benton, and specially pleading that they purchased the negroes in good faith for a valuable consideration, and without any notice of the trust lien; and also the limitation of two years.

John Hunter filed an amended answer under oath, alleging that John Hunter and Samuel Benton alone composed the firm of Hunter & Benton; that neither Jacob B. Hunter nor any one else, had any interest in it. On the trial, the plaintiffs read in evidence, the deed of trust from John Hunter to Green K. Hubbard, with the certificate thereto, showing that it was recorded in Marshall county, Mississippi, on the 17th day of November, 1851, and in Fayette county, Texas, on the 13th day of February, 1854. They also read depositions of witnesses, tending to prove the insolvency of Hunter & Benton at the date of the execution of the assignment by them to Green K. Hubbard.

A. R. Gates, for plaintiffs, testified that he had a meeting with the defendant, John Hunter, and his son H. H. Hunter, for the purpose of trying to make a settlement in reference to sums of money which were alleged to have been paid by Green K. Hubbard, the beneficiary in said trust, on account of the claims of Hunter & Benton, and during the conversation thus had, John Hunter admitted that Green K. Hubbard had paid for the benefit of Hunter and Benton to various parties, in the years 1853, 1854 and 1855, large sums of money, amounting to some nine thousand dollars. That John Hunter further admitted that Green K Hubbard, had become personally responsible for other liabilities on account of Hunter & Benton, and his property was attached there-

for in Mississippi. He further admitted that the assets of Hunter & Benton were insufficient to pay off their liabilities, and other admissions of a like character. They, also, read the transcript of a judgment rendered on the 16th day of January, 1855, in the Circuit Court of Marshall county, Mississippi, in a suit on a note made by John Hunter, Samuel Benton, G. K. Hubbard and Thomas Banks, in favor of Peter W. Lucas, for $2,102 76, which appears to have been satisfied by Green K. Hubbard as assignee of Hunter & Benton. They also read the depositions of a witness in reference to the payment of a draft by Green K. Hubbard in favor of Titus & Co.

The defendants read in evidence the bills of sale from John Hunter to H. H. Hunter, from the latter to Whittenburg & Sergeant, and from Sergeant to Morrow. They also read in evidence the depositions of many witnesses in reference to the various transactions between the parties; but as they are not specially referred to by the court, they are not here stated.

The defendants objected to the introduction of the evidence in relation to the insolvency of Hunter & Benton, because the same was irrelevant, and not pertinent to the issues involved. They objected to reading in evidence the draft in favor of Titus & Co., and to reading the transcript of the judgment in favor of Peter W. Lucas. They also objected to reading an account rendered purporting to be the account of Green K. Hubbard to Hunter & Benton, signed "J. H. B." They also objected to the testimony of A. R. Gates as to the admissions of John Hunter. All of these objections were overruled, and the defendants excepted.

Attached to the statement of facts in the record filed in the Supreme Court is an original paper, showing a statement of account between G. K. Hubbard and Hunter & Benton, and a balance in favor of the latter. The only reference to this paper found in the statement of facts, is the following, to wit: "The plaintiff read in evidence the account marked thus X X and sent up by order of the court."

Among the many instructions asked by the defendants and refused by the court, was one as follows:

"Before the plaintiffs can recover in this action, they must show,

1st, that Green K. Hubbard paid a debt or debts covered by the deed of assignment; 2d, that the assets were not sufficient to have paid them; 3d, that he demanded possession of the negroes covered by the trust deed, and possession was refused him."

Among the charges given by the court, is the following: "If you believe from the evidence, that J. B. Hunter was in reality a partner of the firm of Hunter & Benton, and interested in the affairs of the firm as a partner, you will not consider his testimony as before you."

Verdict and judgment for plaintiffs for $720, and a decree that the negroes be sold to satisfy the same; motion for new trial overruled. The defendants appeal.

*William G. Webb*, for appellants.

Moore, J. But few of the many questions that were raised in this case in the court below require serious consideration. The greater number of them were probably presented by appellees' counsel during the hurry and confusion of the trial in the District Court, without having fully considered their soundness or bearing in connection with the varied and complicated issues of law and facts that were involved in the case.

The court did not err in refusing to sustain the demurrer to the amended petition alleging an individual indebtedness from John Hunter to Green K. Hubbard, the beneficiary in the trust deed. The individual indebtedness and accounts between said parties were brought into the suit by the allegations of the defendants' answer. The defendants charged, that the debts due Hubbard had been overpaid him by Hunter, with his individual means, and that there was a balance due him individually, as well as the firm of Hunter & Benton, for which they asked a judgment. It was perfectly legitimate, that Hubbard should present his side of the private accounts, and should show, if he was able to do so, that the payments made him by Hunter, were in satisfaction of other debts than those on account of which this suit was brought.

The testimony with reference to the insolvency of Hunter & Benton seems to have been, so far as we can perceive from the

record, irrelevant; but it can in no manner, have affected the result of the case; and if improperly admitted, must be regarded as an immaterial error. Nor was there any valid objection to that part of the answer of the witness, Barrett, to the 2d interrogatory, which was excluded by the court. But the other parts of his testimony showed the amount of the notes and accounts that went into Hubbard's hands by virtue of the assignment of Hunter & Benton; and that part of his answer which was excluded was therefore entirely unimportant.

It was the duty of Hubbard, at the expiration of eighteen months from the date of the assignment, if called upon by the assignees, to have rendered an account showing the manner in which he had disposed of the assets that had been assigned to him. And Hunter might, no doubt, have required that he should do so, and that he should also show that he had made a proper appropriation of the assets assigned to him, before he could enforce a sale of the negroes conveyed by the trust deed. If the general allegations in the petition and amended petitions with reference to the disposition that had been made of the assets were not deemed sufficient, the defendant, Hunter, should have asked the court to require from Hubbard a more full and satisfactory exposition. But, after having gone to trial, he could not then object that Hubbard failed to render an account. The appropriation of a part of the assets assigned to him by Hubbard, to pay other debts of Hunter & Benton than those enumerated in the assignment, if done by the consent of Hunter, (as Gates' testimony tended to prove was the fact,) is not a matter of which he can complain. We are also of opinion that the objections of the defendants to the evidence as to the payment of the Lucas judgment, and the note for $140 58 in favor of Titus & Co., were not well taken. The allegations with reference to these items in the plaintiffs' claim were certainly liable to criticism, and must have been held insufficient upon special exceptions. But as the allegations of the petition were not excepted to on this account, we think the evidence should not have been excluded. And the objections to the testimony of Gates were wholly untenable. That the settlement about which he testifies was not to be conclusive of the matters between the parties, and that mistakes,

Hunter v. Hubbard.

if there were any, were to be corrected, might be properly considered in determining the weight that should be given to the evidence, but furnished no ground for its exclusion. The settlement and admissions made by Hunter should not have been excluded, because Benton was not present or a party to them. In their petition as intervenors, they allege that they are still partners as to all matters of a firm nature; and, of course, a settlement by one partner, or admissions by him with reference to the business of the firm, would be binding upon all members of it. But aside from this, Hubbard, in this action, was seeking to enforce payment, after the partnership funds were exhausted, of the balance still due him from the individual property of Hunter that had been conveyed by him in trust for that purpose; and it surely cannot be insisted that the admissions of Hunter could not be received as evidence to show the amount for which his individual property was, under the trust deed, justly chargeable. It could with as much propriety be said that the trust deed was also void, because the other partner was not a party to or bound by it.

Nor did the court err in leaving the jury to determine as a question of fact whether J. B. Hunter, whose deposition had been taken by the defendants, was a secret partner of the firm of Hunter & Benton. The plaintiffs, in their amended petition, alleged that he was. The statement by the intervenors in their petition, that the defendants, Hunter & Benton, alone composed said firm, did not impose upon the plaintiffs the necessity of a denial of it under oath to authorize them to show by testimony that J. B. Hunter was a member of the firm, as they had charged. If he was a secret partner, he could not have been joined as a party in the suit. Although the testimony offered by the plaintiffs to prove that he was a partner was slight, it was sufficient to authorize the court to submit it to the jury as a controverted question of fact.

The objections of the defendants to the account offered by the plaintiffs, as an account stated between G. K. Hubbard and John Hunter, were well taken, and should have been sustained. There was no evidence, as far as we can learn from the record, to authenticate the paper offered as a statement of accounts between said parties, or anything to explain where, when and by whom, or for

35

what purpose, it was made. It is evident, therefore, that it was not admissible, under these circumstances, for any purposes, much less could it be received as evidence of an accounting between the parties, and that the balance shown by it to be due Hunter had been agreed upon and stated by the parties. Nor can its admission be regarded as an immaterial error. The defendants had offered evidence tending to prove that there was a much larger amount due from Hubbard to Hunter, on a settlement of their individual accounts, than is shown by this statement. We cannot say what effect it may have had upon the jury.

The defendants also insist that the suit was improperly brought, because it did not appear that a demand of the negroes had been made of Hunter, by the trustee, previous to its institution; and also that the court erred in charging the jury that the suit was not barred by limitations, because less than four years had elapsed from the earliest period at which, by the terms of the trust deed, the cause of action could have accrued previous to the commencement of the suit. These objections are manifestly contradictory and incompatible with each other, and for this reason the court might perhaps have well declined considering them. (Emmons v. Oldham, 12 Tex., 18.) The statute of limitations could not be insisted upon as a defence, unless the property had been held subsequent to the accrual of the plaintiffs' cause of action. If the possession of the defendants was, in contemplation of law, under and in subordination to the trust deed, until there was a demand of, and refusal by them, to surrender the slaves, they could not claim that their previous possession had been adverse to the trustee, or invoke the statute of limitations in their defence.

It is apparent, however, that in the future progress of this case the statute of limitations may become a question of controlling importance. We think it therefore proper that we should give our views with reference to it. All trusts are said to be of two general classes: First, express trusts, created by the direct and immediate contract of the parties, such as mortgages and deeds of trust, conveyances to bailees, factors, agents, &c., or from official appointments to which this relationship is attached by law—as executors, administrators, guardians, disbursing and collecting

officers, &c.; in short, all who fill fiduciary situations, created either by the act of the parties or by the appointment of the law. Secondly, implied trusts; when a party has not gotten possession of the property by any recognition of the trust relation, or a consent to hold in that character, but claims to have acquired and hold it in his own right, or for altogether different and distinct purposes from that for which the trust was created, and when he is by construction of law, for fraud or from notice of the pre-existing trust, converted into a trustee.

To the first of these classes of trust, it has universally been held that the statute, as a general rule, has no application. The statute does not begin to run in favor of the trustee so long as the trust continues, and is acknowledged to be a continuing subsisting trust, for the reason that the possession of the trustee is the possession of the *cestui que trust*. But if he claim to hold the trust fund as his own, and adversely to the *cestui que trust*, and the latter has knowledge of the fact, then from the time of such adverse holding the statute will run in favor of the trustee. (Kain v. Bloodgood, 7 John., ch. 123; Boone v. Chiles, 10 Pet., 223; Williams v. Watkins, 10 Eng. Law and Eq., p. 23; Keatin v. Greenwood, 8 Geo., 97.) And so in general, when the relation is terminated by a breach of trust. (Wickliffe v. city of Lexington, 11 B. Monr., 161.)

Where the trust, however, it is said, is merely implied or constructive, there has been some disagreement among the cases, but the better opinion appears to be that, as in general the facts out of which such trust arises, from their very nature presuppose an adverse claim of right, on the part of the trustee, by implication from the beginning, the statute will commence to run against the *cestui que trust*, from the period at which he could have vindicated his right, by an action or otherwise. (Hill on Trustees, 264, note 2; Ang. Limit., sec. 471.) The latter author says: "It is indeed perfectly clear, that whenever a person takes possession of property in his own name, and is afterwards by matter of evidence or by construction of law changed into a trustee, lapse of time may be pleaded in bar." And the Supreme Court of the United States say: "Though time does not bar a direct trust, as

between trustee and *cestui que trust*, till it is disavowed, yet, where a constructive trust is made out in equity, time protects the trustee, though his conduct was originally fraudulent, and his purchase would have been repudiated for fraud." (Boone v. Chiles, 10 Pet., 223.) And this has been the doctrine uniformly held by this court. (Tinnen v. Mebane, 10 Tex., 246; Wingate v. Wingate, 11 Tex., 430; Hall v. Hall, Id., 526; Grumbles v. Grumbles, 17 Tex., 472.)

These views lead us to the conclusion that if there was an open and notorious denial of the right of the trustee, subsequent to the time that he was entitled to demand possession of the trust property, by Hunter or those claiming under him, which came to the knowledge of the trustee, or occurring under such circumstances that it must be inferred that he had knowledge of it, or if there was an open and visible change of possession of the property under like circumstances, and a subsequent holding by an absolute claim in their own right, by the possessors, the statute of limitations would commence to run against the trustee, and, of course, there would be no occasion for him to demand the property before he could sue for its recovery.

But we are still left to determine what length of time will complete the bar of the statute in favor of the purchaser from the party in possession of the trust property. Will it require four years, the length of time which bars a suit for the recovery of the debt secured by the mortgage or deed of trust? Or will a suit to foreclose a mortgage, or to sell the trust property for the satisfaction of the debt, become barred by the lapse of time which bars suits for the recovery of personal property? If the possession is given to the creditor, and the trust is disclaimed so as to set the statute in motion, the debtor must bring his action to redeem, which seems analogous to that of foreclosure by the creditor, within the bar of the statute, in suits for the recovery of personal property. (Moffat v. Buchanan, 11 Humph., 369; Ang. Limit., sec. 174, and cases there cited.) So if the trustee or mortgagee elect, as he may do, to sue for the recovery of the property, he will be barred by the same rule. (Lawrence v. Beidleman, 3 Yerger, 496.) It is generally said, however, that suits to fore-

close a mortgage are not within the statute, but that courts of equity, as the mortgage is a mere incident of the debt, and is created solely for its security, will not lend their aid to enforce it, when the debt is barred. But this is upon the ground that there is an express subsisting and recognized trust between the parties, otherwise the statute is as binding upon our courts as if the parties were proceeding in a common law form of action. There appears to be no good reason why a mortgagee or trustee in a suit for a foreclosure and a decree of sale, against a party who has openly and within his knowledge held adversely to the trust, should not be barred by the lapse of the same length of time as he would be if he brought his suit simply to recover the possession of the trust property, that he might proceed to sell, by his own act, in accordance with the stipulations of the deed. In either suit the possession of the defendant is divested on account of the superior title of the plaintiff. If the court of equity decrees the sale of the property, which by the terms of the deed the trustee was authorized to sell, it is merely because it will lend its aid in accomplishing that for which the parties had contracted. If two years adverse possession of personal property will give title to a party who obtained possession by fraud and bad faith, (Winburn v. Cochran, 9 Tex., 123,) why shall it not have the same effect against one who claims merely an interest in the property? Will the law give protection to a party who has only a lien or a qualified title to the property, when it will not do the same in favor of the absolute owner? It may be said that the security is a part of the debt, and cannot therefore be barred until that is barred. We cannot see that there is such a necessary connection between the two that this should be the case. They give to the creditor distinct causes of action, and may be enforced in separate suits and by different forms of proceeding, and afford altogether different remedies. Why then may they not be barred at different periods? Cannot a title to personal property be acquired by two years adverse possession, because a debt is secured upon it? It has never been questioned, with us, that a wrong-doer, who takes and holds it in defiance of both the mortgagor and mortgagee, may do so. Is not this the attitude of a purchaser from the party in pos-

session, who purchases and claims by absolute title, and holds in his own right? The mortgagor, of course, cannot pretend that the purchaser holds for him, nor can the mortgagee do so when he knows that the purchaser openly holds and claims adversely to him. It cannot be said that he is estopped from denying the trust, because he has purchased with a knowledge of it. For this reason the law makes him a constructive trustee for the party, who otherwise would be defrauded. But it places him in no worse condition than any other fraudulent possessor. The question, then, must be altogether one of fact, whether the statute of limitations has been set in motion in favor of the purchaser—if not, the property is bound until the debt is barred; if it has, the suit either to recover the property or effectuate the lien upon it is barred after the lapse of two years. The charge of the court, therefore, fixing the bar at four years, was erroneous.

Whether in case of an absolute sale of personal property, and and a change of possession within the knowledge of the mortgagee, the statute will commence to run against him, unless knowledge is brought home to him that the party is claiming adversely; or whether until this is done he may rely upon the presumption that he has purchased and holds subject to the mortgage ; and if this is not the case whether he must, at his peril, take notice of the change of possession of personal property, are questions which we need not, in the present attitude of the case, authoritatively determine. It is sufficient at present to say that if the presumption should be ordinarily, that the purchaser acquires possession subject to the lien; yet there was evidence in the case from which it might be inferred that the trustee knew that the parties in possession were claiming in their own right, and adversely to him.

The judgment is reversed, and the cause remanded.

Reversed and remanded.