## LANG et al. v. SHELL PETROLEUM CORPORATION et al.

### No. 10927.

Court of Civil Appeals of Texas. Galveston.

Dec. 21, 1939.

As Modified on Denial of Rehearing
May 30, 1940.

Levert J. Able, Fouts, Amerman & Moore, and Sidney Benbow, all of Houston, for appellants.

Gerald C. Mann, Atty. Gen., State of Texas, and R. E. Kepke, Asst. Atty. Gen., State of Texas, for appellees Texas Prison Board, Board for Lease of Texas Prison Lands, and others.

Carlos B. Masterson, of Angleton, A. E. Groff, of Houston, and Thompson, Mitchell, Thompson & Young, Truman Post Young, Thomas L. Croft, and Calvin A. Brown, all of St. Louis, Mo., for appellee Shell Petroleum Corporation (now Shell Oil Co., Inc.).

CODY, Justice.

One John Lang, a wealthy white man, conveyed in 1884 the land here involved to Anthony Thomas for a purchase price which was secured by a vendor's lien. On October 20, 1893, Lang again deeded the same land to Thomas for $1,700, which was evidenced by ten promissory notes for

$170 each, due, respectively, in 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 years; and these notes were secured by a vendor's lien retained in the deed, and additionally secured by a deed of trust.

Lang died in December of 1899, and by his will he nominated John Juliff as independent executor and left one-half of his residuary estate to his daughter, Julia Lang, and the other half thereof to her six or seven children. Julia was a negress, and the father of her children was one D. C. Cleveland, a white man.

A will contest was instituted by the heirs of John Lang, and carried through the district court, but the result of the contest was that the will was duly probated. John Juliff qualified as independent executor on March 9, 1900, and in the August Term, 1900, an inventory was filed, and among the assets listed, running into many thousands of ·dollars, were listed five of the vendor's lien notes given by Thomas as part of the consideration for the aforesaid deed.

During the August Term, 1900, Julia Lang applied for appointment as guardian of the estate of her minor children,—D. C. Cleveland, Jr., Florence Cleveland, J. T. Cleveland, Emil Cleveland, Lottie Cleveland, and John Lang, stating in her application that the half interest which the minors would receive under the will of Lang would consist of real and personal property of the estimated value of $50,000. She was appointed and qualified as guardian in early September, 1900. Thereafter, in October, 1901, Julia, as guardian of the estate of her children, filed an inventory, appraisement and list of claims. The vendor's lien notes aforesaid were not then listed. But in her petition then filed, she stated that. all the property owned by said minors was willed to them by Lang, their grandfather. She further stated that a will contest had been filed, making it necessary to employ counsel to protect the interest of herself and children, and, having no other means by which to employ counsel, she made a .contract with Branch T. Masterson, Capt. J. C. Hutcheson, and Eugene J. Wilson, attorneys (hereafter referred to as Masterson et al.), to secure the probate of the will, agreeing to give them a contingent one-third of the residuary estate, if they should procure the probate of the will. Further, she stated, the lawyers so employed were successful, and the contract of employment was "with the knowledge, consent and approval of John Juliff the proponent for the probate of said will and the executor named and appointed therein." She further stated that she and said attorneys had agreed upon and made a partition of the residuary estate, and that in said partition the following property was awarded to said. attorneys. Among the assets turned over to the lawyers were listed the full interest in the five vendor's lien notes. Her petition concludes: "* * * that your petitioner, believing that said children should bear one-half of said compensation paid to said attorneys, and believing that your petitioner would have and own an undivided one-half of all said property allotted and awarded to petitioner and her said children in said partition with said Wilson, Hutcheson and Masterson, has only inventoried and listed an undivided one-half of said property as the property of said children. Petitioner says that by reason of the premises petitioner is entitled to one-half of said property so allotted and awarded to her and her said children in said partition and that said children jointly are entitled to the other one-half of said property."

On October 22, 1901, the county court, in response to the prayer of Julia's petition, approved the inventory and list of claims filed in the estate of the minors, approved the contract of Julia with the attorneys aforesaid, and the partition made with them.

On May 9, 1903, Thomas conveyed the land here involved, and which had been theretofore conveyed to him by Lang, to Branch T. Masterson in satisfaction of the five vendor's lien notes, hereinabove referred to. Sometime prior to such date, Masterson had acquired from Capt. Hutcheson and Wilson their interest in said notes. Said notes were found among the effects of Branch T. Masterson after his death in 1920, endorsed in blank by the independent executor. On December 31, 1917, Mr. Masterson conveyed the said land (with others) to the Prison Commission of Texas. The Board for Lease of Texas Prison Lands, on November 14, 1934, gave an oil and gas lease on said 400-acre tract, along with other land, to one Ryan for a bonus of $17,156.60, and Ryan assigned the lease to the Shell Petroleum Corporation on November 20, 1934, and that Company is producing oil therefrom.

This action is brought by the five surviving children of Julia Lang, i. e. the Cleve-

lands, to recover in trespass to try title one-half of the 400 acres, and for the oil taken therefrom, etc.

D. C. Cleveland, one of the five surviving children, was the only one to give oral testimony at the trial. He testified that he knew Masterson, Capt. Hutcheson, and Mr. Wilson, and knew that they were the lawyers who procured the probate of his grandfather's will, and that they had been paid for their services out of part of the property left by Lang.

The case was tried without a jury, and judgment rendered against the Clevelands.

The Cleveland devisees claim that they became vested with the title to an undivided half interest in the five vendor's lien notes. They claim it was beyond the power of the independent executor to transfer the notes to the attorneys who procured the probate of the will, for their services, and contend that the evidence is not sufficient to establish that said executor ever attempted to do so; but that, to the contrary, the proof is that the guardian of the estates of the minors attempted this, and it was beyond her power, and was likewise beyond the power of the probate court, and the court could give no validity to the contract of employment of said attorneys in so far as it contemplated the transferred property of the minors, or in so far as it sought to approve a partition which set aside said notes to said attorneys as their property, and that as against said minors all such action was absolutely void, and left the ownership of an undivided half of the notes in said minors. It is their further contention that, when Thomas conveyed the 400-acre tract to Mr. Masterson in satisfaction of said vendor's lien notes, that he thereupon took title to but one-half of said land in his own right, and took the remaining half as constructive trustee for the Clevelands. And, upon the same reasoning, based upon the same showing made by the probate records in regard to the five vendor's lien notes in both the Lang estate and the estates of the Cleveland minors, it is their further contention that the Prison Commission of the State of Texas took with full notice of their rights, and likewise took as their constructive trustee under the deed to it from Branch T. Masterson, dated December 31, 1917.

█ If it be conceded that Masterson acquired no title to an undivided half interest in the five vendor's lien notes (and we do not pass on that point), there can be no doubt that he at least appropriated and converted them. Such conversion would, by operation of law, have constituted him a trustee. The trust, however, would not be an express trust; it would not be a trust created by a contract whereby Masterson would assume the position and relation of trustee, but the law would impose on him the obligations of trustee. When Masterson recognized the notes as being within his possession and control, and we know he did this not later than when he accepted the deed conveying to him the 400-acre tract in satisfaction of said notes, he became subject eo instanter to the right of the Clevelands to demand said notes, or their interest therein. And except for this disability of minority, the statute of limitation would have begun running against them prior to the date he accepted said deed. It is obvious that if Masterson was chargeable as a trustee, the trust was merely a constructive trust, and a constructive trust is within the statute of limitations. As said in 65 C.J. 534: "As between the trustee and beneficiary of a constructive trust, the statute of limitations begins to run against the enforcement thereof from the date of its inception, unless there has been a fraudulent concealment of the cause of action. No disclaimer or disavowal of the trust by the trustee is necessary." In Wingate v. Wingate, 11 Tex. 430, 433, Judge Lipscomb said: "But it does not follow, that every kind of trust forms an exception to the operation of the statute of limitations; if so, half the business transactions of men would be removed from its influence. And the doctrine has been settled, by a train of decisions, from the case of Lockey v. Lockey, Prec. in Ch. 518, decided by Lord Macclesfield, down to the present time, that to remove a trust from the operation of the statute, it must be such a trust, technically, as is created by the mutual confidence of the parties, such as equity alone can take cognizance of and afford redress. If it is a trust that Common Law Courts could give relief, the statute will run, although the party may have sought his remedy by a suit in chancery. In such cases, the fact of the suit being brought in the Court of Chancery, will not defeat the statute; it can be avoided only by a technical trust, of which the Courts of Common Law could afford no relief. When it is laid down that so long as a trust is continuing and subsisting, the statute does not commence

to run between the cestui que trust or his assigns and their trustee, the doctrine applies to such cases only as are strictly and technically trusts, created and sustained by the principles of equitable jurisprudence, exclusive of, and in contradistinction to, trusts of Common Law cognizance; and even in such cases the statute would commence to run from the time the trustee disavowed the trust, or did any act conclusively showing that he did not hold as trustee."

Again in Tinnen v. Mebane, 10 Tex. 246, 252, 60 Am.Dec. 205: "All implied and constructive trusts, all which are cognizable at law, are subject to the bar of limitation; and equity applies the same limitation to equitable demands, that is applied, in analogous cases, at law. *It is only where the trust is the mere creature of equity—exclusively cognizable within that jurisdiction, and is a subsisting, continued and acknowledged trust,* that the statute has no operation." (Emphasis ours.)

Again, our Supreme Court held in Kennedy v. Baker, 59 Tex. 150, 157: "In cases of implied or constructive trust, where it is sought for the purpose of maintaining the remedy to force upon the defendant the character of trustee, such courts will apply the same limitation as provided for actions at law" (citing authorities). In the last mentioned case, the court quoted with approval the following language of a situation where one obtained money from an executor without lawful authority, "The law, to be sure, would turn him into a trustee; but he did not become such by contract, but was such by implication of law, because of his wrongful possession of money which did not belong to him; nevertheless, he held it in his own right, and for his own benefit, adversely to the complainants." Again, in the same opinion of our Supreme Court, 59 Tex. at page 159, "In Wilmerding v. Russ, 33 Conn. [67] 80, the court said: 'A court of equity would undoubtedly declare the sale to be one which was invalid, as against the policy of the law and constructively fraudulent; but in cases of constructive fraud, the statute of limitation applies. The decisions to this effect are conclusive.'" (Citing authorities.) See also Carlisle v. Hart, 27 Tex. 350.

Now limitation did not start running at the time Masterson converted appellants' interest in the notes (if he did convert same, and which we assume only for argument's sake), because of the disability of minority under which the Clevelands were at that time. The fact, however, that Masterson subsequently in effect invested half the proceeds of the notes in the land in question, does not mean that the Clevelands thereby became vested with the land so that they could be divested of the title only by adverse possession. The authorities already cited show this is not true. The right which the Clevelands acquired to follow the proceeds of the notes into the 400-acre tract was not a present vested property right, nor one vested in possession, but lay in the remedy or action which a court of equity would give to trace the proceeds of the conversion. For the same wrongful conversion, courts of law gave other remedies. The equity which the Clevelands had was a mere equity which could ripen into an equitable title only after suit had thereon, and its assertion in a court of equity could be resisted if long delayed by the plea of laches. As stated in 21 C.J. 215, "In determining whether plaintiff is barred by laches, it is important to consider the nature of the right asserted, and the character of the relief sought, and, as has been said, the nature of the proceedings resorted to. In reference to the nature of the right asserted and the relief sought, there is a well recognized and fundamental distinction between two classes of cases into one or the other of which all cases fall. The first class includes those cases where protection is sought against a violation of a present vested property right or what has been termed an executed interest. The second class includes those cases in which plaintiff's right is not vested in possession but lies in action, *and it is necessary to obtain the peculiar relief afforded by courts of equity in order to invest plaintiff with the right claimed.* This kind of right or interest has been termed 'executory'. In the case of executory interests, the doctrine of laches applies fully. * * *" Among the illustrations of "executed" and "executory" interests, cited in a note to the text just quoted, is this: "(2) Cases involving specific performance of contracts * * *, and suits to establish and enforce an implied or resulting trust * * * are illustrations of executory interests." To the same effect are the cases of Montgomery v. Noyes, 73 Tex. 203, 11 S.W. 138, and Mayes v. Manning, 73 Tex. 43, 11 S.W. 136, 137.

In Mayes v. Manning, supra, the facts were that the father of the plaintiff purchased the land sued for with money advanced by his wife, plaintiff's mother, taking the deed in his own name. Plaintiff's mother died, and his father re-married again in 1854, and resided thereafter on the land until his death in 1886. Plaintiff knew how the land was purchased as early as 1874. The father admitted his son's title to half the land, but denied his right to the other half. The court held: "We think, too, that, plaintiffs having alleged title and established it by proof of a resulting trust, defendants were properly entitled to the application of the doctrine of stale demand, under their plea of not guilty." And, again, "The plaintiff's case, whatever form it takes, is substantially the assertion of a resulting trust. Whether such a trust exists in his favor or not depends upon whether, in point of fact, it was his mother's money that paid for the land." It is quite apparent that the court considered that the plaintiff had no title or "present vested property right or what has been termed an executed interest,"—to apply the language hereinabove quoted from Corpus Juris—but considered that "plaintiff's right is not vested in possession but lies in action, and it is necessary to obtain the peculiar relief afforded by courts of equity in order to invest plaintiff with the right claimed", to further apply the language hereinabove quoted from Corpus Juris. We say this is quite apparent, because the Supreme Court held that stale demand cut off plaintiff's right, and laches is "inexcusable delay in asserting a right; an implied waiver arising from knowledge of existing conditions and an acquiesence in them; such neglect to assert a right, as taken in conjunction with lapse of time more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity; such delay in enforcing one's rights as works disadvantage to another's." 21 C.J. 210, 211. Had the Supreme Court considered that the plaintiff owned a vested equitable property right in the land, it would not have held that plaintiff was cut off by laches from recovering his property. Courts of equity never bar plaintiffs from asserting present vested property rights, whether equitable or legal, except where an action therefor is barred by the statute of limitation. 21 C.J. 215.

In the recent case of Bordages v. Stanolind Oil & Gas Company, 129 S.W.2d 786, we stated it was our opinion that the Supreme Court had repudiated the Mayes and the Montgomery cases. The Supreme Court, by dismissing the writ, approved the judgment as correct, but did not approve our opinion. In expressing the belief that the Supreme Court had repudiated the principle it had recognized universally down to and including the Mayes and Montgomery cases, we followed Loomis v. Cobb, Tex.Civ.App., 159 S.W. 305, 309. Though the Supreme Court refused an application for a writ of error in this latter case, this was in 1913, and did not at that time have the effect of approving the opinion in the case. The Loomis case was in fact correctly decided. The plaintiff possessed an equitable title to the property sued for, and not a mere equity, i. e., remedy, whereby he might, if he brought suit, acquire a title. The facts in the Loomis case were that certain land was deeded to one Gutierres, who was at the time married to one Dolores. While he owned the land, and before he sold it, his wife, Dolores, died intestate. She left children surviving her, the issue of a former marriage. These children conveyed their title to Cobb. Gutierres held the legal title, but as to an undivided half interest in the property, he owned it as an actual trustee for his wife, and for her heirs after her death; and his wife, Dolores, was vested with a present property right in the property, and her children succeeded thereto, after her death. Being vested with an estate in land, and not a mere equity, they could be divested only by adverse possession, or by the intervention of the rights of an innocent purchaser for value. It is quite clear that the opinion in the case of Loomis v. Cobb, supra, recognizes no distinction between the status of a true trustee, such as where a husband is the grantee in a deed with his wife, a true cestui que trust, and the status of a trustee in a resulting trust, which is implied for the sake of the remedy.

Yet the distinction just referred to is stated by Corpus Juris, in the quotation above, to be well recognized and fundamental. And the distinction is recognized in many Texas cases. We will quote from another, Hunter v. Hubbard, 26 Tex. 537, 546, 547, 548: "All trusts are said to be of two general classes: First, express trusts, created by the direct and immediate contract of the parties, such as mortgages and deeds of trust, conveyances to bailees,

factors, agents, &c., or from official appointments to which this relationship is attached by law—as executors, administrators, guardians * * * in short, all who fill fiduciary situations, created either by act of the parties or by the appointment of the law. Secondly, implied trusts; when a party has not gotten possession of the property by any recognition of the trust relation, or a covenant to hold in that character, but claims to have acquired and held it in his own right, or for altogether different and distinct purposes from that for which the trust was created, and when he is by construction of law, for fraud or from notice of the pre-existing trust, converted into a trustee. * * * Where the trust, however, it is said, is merely implied or constructive, there has been some disagreement among the cases, but the better opinion appears to be that, as in general the facts out of which such trust arises, from their very nature presuppose an adverse claim of right, on the part of the trustee, by implication from the beginning, the statute will commence to run against the cestui que trust, from the period at which he could have vindicated his right, by an action or otherwise. * * * And the Supreme Court of the United States say: 'Though time does not bar a direct trust, as between trustee and cestui que trust, till it is disavowed, yet, where a constructive trust is made out in equity, time protects the trustee, though his conduct was originally fraudulent, and his purchase would have been repudiated for fraud.'"

We are unable to agree that the Supreme Court has abolished this (quoting from Corpus Juris, supra) "well recognized and fundamental distinction between two classes of cases into one or the other of which all cases fall." We have seen that Loomis v. Cobb, supra, cannot be accepted as authority to that effect.

The case of Carl v. Settegast, Tex.Com. App., 237 S.W. 238, presents an instance of true trust, and the interest of the cestui could be divested only by adverse posses-

sion. The case of Hand v. Errington, Tex. Com.App., 242 S.W. 722, is also relied on by appellants. The opinion in the case does indicate the view that a constructive trust vests a property right in possession in the "cestui", and not a mere equity, against practically the universal current of decisions, including our own Supreme Court. The Supreme Court merely approved the judgment in the case. It did not adopt the opinion.

The case of McCampbell v. Durst, 15 Tex.Civ.App. 522, 40 S.W. 315, opinion by Judge Williams before he was advanced to the Supreme Court, presents the most masterly and comprehensive discussion of the rule herein involved of any that we have been able to find.

Under the facts in this case Masterson acquired the notes, claiming to own them. This claim was recognized by the maker. In satisfaction of the notes he deeded to Masterson the land for which they were a part of the purchase price. If the contention of appellants be sound, had he deeded to Masterson any other land in satisfaction of the notes, Masterson would have taken title thereto in trust for appellants, and their interest would have been a vested property right in such other land, instead of an equity to impress a trust thereon—and if this is law, land titles are very insecure in Texas.

How can it be contended that an equity, which entitles a plaintiff to recover from one who is charged as an implied trustee (the trust being implied of course for the sake of the remedy), is of a different status from that of an equity which entitles a plaintiff to specific performance of a contract? Both are mere remedies which can be had in a court of equity, and neither are vested rights in property. No one would contend that a right to specific performance would confer a vested right before action ripened it into judgment.

The judgment of the court below ought to be affirmed and it is so ordered.

Affirmed.