| 47 | 503 |
| 77 | 447 |
| 47 | 503 |
| 83 | 449 |
| 47 | 503 |
| 86 | 420 |
| 47 | 503 |
| 92 | 297 |

WILLIAM EBORN V. GEORGE B. ZIMPELMAN, ADM'R, &c.

1. Suit was brought, in 1871, against an administrator whose intestate, it was alleged, had executed, in 1846, the following instruments: "Borrowed and received from William Eborn, nine hundred dollars, which I promise to return when called for, with interest. February 3, 1846. (Signed) Thomas Eborn." "Received of William Eborn, six thousand five hundred dollars, which I promise to invest in lands, or return the same when called for, with interest. May 14, 1846. (Signed) Thomas Eborn." The petition alleged that the money had been received on both instruments by the obligor, with the understanding that he should go West and invest the same in lands for William Eborn, and if he failed to do so, the money should be returned, with interest; that soon after the last instrument was executed, the obligor left North Carolina, in which State the transaction occurred, and was not heard from thereafter until 1870. The statute of limitations of four years was pleaded as a defense: *Held*—

    1. The receipt for nine hundred dollars, borrowed to be returned "when called for," created a cause of action from its date, and against it the statute ran from the time of its execution.

    2. Against the receipt for six thousand five hundred dollars the statute began to run after the lapse of a reasonable time within which to apply the money as required; and after the lapse of such time, no demand was necessary.

    3. The claim was not an express trust, but must be regarded as a moneyed demand, barred by limitation, in the absence of a sufficient acknowledgment within four years before the institution of the suit.

    4. The averment that the maker of the instruments left soon after their execution, and that his whereabouts was not known to the holder of the obligation until 1870, does not make out such a

case of fraud as constitutes an exception to the statute of limitations; there being no express charge of fraud, nor any allegation that efforts were made to ascertain his place of residence.

    5. The mere removal of a debtor, without communicating to his creditor the place of his new domicil, does not constitute such a fraud as will stop the running of the statute.

2. DISTINGUISHED.—This case distinguished from Munson *v.* Hallowell, 26 Tex., 478.

3. EVIDENCE OF HANDWRITING.—A signature offered for the purpose of comparison cannot be proved to be an original and a genuine signature, merely by the opinion of a witness that it is so, such opinion being derived solely from the witness's general knowledge of the handwriting of the person whose signature it purports to be.

4. PHOTOGRAPHIC COPIES—EVIDENCE.—Photographic copies of instruments sued on can only be used as secondary evidence; like letter-press copies, they are but copies, which may or may not be *fac similes* of their originals; it is a question of fact, whether a photographic copy of a writing, when offered in evidence, is a mathematically exact reproduction of its original.

5. PHOTOGRAPHIC COPY—EVIDENCE.—The mere fact that a witness, whose deposition is offered to establish a plea of *non est factum*, is a resident of another State, and the instrument to which the plea applies is on file in a Texas court, will not authorize the introduction in evidence of his opinion of the handwriting, based on a photographic copy of the instrument attached to interrogatories.

6. EVIDENCE.—Though the issue, on which improper evidence was admitted, is immaterial, yet, if it be so intimately connected with a material issue that it cannot be known whether it did not affect the finding of the jury on the material issue to appellant's prejudice, the case will be reversed.

7. PRACTICE.—Section 195, of Probate Law of 1870, referred to proceedings on the probate side of the court, and not to ordinary suits in the District Court.

8. PLEA OF NON EST FACTUM may be made by an agent of the administrator; and may be made by an heir, with consent of the administrator as such agent, even when the administrator may be unwilling to make the necessary affidavit.

APPEAL from Travis.    Tried below before the Hon. J. P. Richardson.

The opinion states the case.

*N. G. Shelley* and *Peeler & Fisher*, for appellant.—The second exception—to the admission of photographic copies—

presents a novel question in the law of evidence. We have been able to find but few cases in which it has been discussed. In volume 4, American Law Review, page 625, is an interesting article on the celebrated "Howland Will Case," which will, we think, satisfy the court of the utter unreliability of this character of evidence. The case involved a very large amount, the costs alone exceeding $150,000, and was managed by very able counsel, one of whom, as stated by the reviewer, expressed, in court, the opinion, "that all the testimony drawn from photographs was clearly inadmissible;" and the author adds: "we are not aware of any decision admitting such testimony upon a question of handwriting." (Page 653.)

In Daly v. Maguire, 6 Blatchford, 137, which was an action for the infringement of the copyright of a play, the plaintiff applied to the court to take a printed programme of a performance at a theatre in San Francisco, which was annexed to and filed with the deposition of the defendant, with a view of annexing it to a commission which plaintiff proposed to send out for examination of witnesses in San Francisco, Blatchford, judge, said: "The application is granted on condition that the plaintiff shall, under the direction of the clerk, first cause to be made and placed on file, in lieu of the original exhibit, photographic *fac similes* thereof." It does not appear that there was any question of forgery in this case. It seems, too, that counsel and court both thought it necessary to send the *originals*, and not the *photographic copies*, with the depositions. In the case at bar, the photographic copies, and not the originals, were sent. If the originals had been sent and lost, the photographic copies might have been used as secondary evidence of the original contract, but under no circumstances would they have been admissible to prove the genuineness of the handwriting. Mr. Hillyer, who took the photographic copies, in this case, whilst having a good deal to say upon the subject, does not state the refractive power of the lens, the angle at which the originals were

inclined to the sensitive plate, or the accuracy of the focusing. While he thinks it is "mathematically accurate," he does not know whether it was the same size as the original, as he "*was not particular in that respect.*"

In support of the third exception taken to the rejection by the court of certain paper writings, which had been sworn to be genuine by the witnesses West, Zimpelman, Cook, and Miller, which were offered by the plaintiff, that the jury might compare them with the papers sued on, we cite the following authorities: Hammon's Case, 2 Greenl., (Me.,) 33; Bush v. Lyon, 9 Conn., 55; Myers v. Toscan, 3 N. H., 47; Richardson v. Newcomb, 21 Pick., 315; Travis v. Brown, 43 Pa., 9.

There were but two questions in the case, viz: Were the claims barred by limitation?—were the claims forgeries? A slight examination of the charge will, we think, satisfy the court that it was clearly erroneous.

When Thomas came west, he held the money in his hands under a direct trust to invest in lands, and he continued so to hold it until William had the opportunity of ascertaining whether he had made the investment; and on his failure, of calling on him for its return. If, as alleged, William never heard of Thomas until a short time before his death, in 1870, there was no possible opportunity for him to put an end to the trust by ascertaining that Thomas had not made the investment, as promised, and calling on him for a return of the money. The trust was, therefore, a continuing and subsisting one, and the statute did not commence to run until 1870. We cite, on this point, Wingate v. Wingate, 11 Tex., 430; Murchison v. Payne, 37 Tex., 306; Stanton v. Stanton, 37 Vt., 411; Baker v. Joseph, 16 Cal., 174; Buchanan v. Parker, 5 Ired., (N. C.,) 597; Emmons v. Hayward, 6 Cush., (Mass.,) 501.)

The administrator was unquestionably the only proper party to be sued, and the only person who, under the law, could interpose or swear to the plea of *non est factum.* With-

out the oath, it was no plea at all, and should not have been considered. (Paschal's Dig., arts. 1442, 1443; Johnston *v.* Jefferson, 31 Tex., 332; Drew *v.* Harrison, 12 Tex., 282.)

In this case, the papers sued on were charged to have been made by the intestate, and the statute expressly provides in such case that it "shall be received in evidence," unless some suspicion is cast upon it by the affidavit of the administrator of the intestate. This not having been done, the claim must be regarded as fully proved. (Yeary *v.* Cummins, 28 Tex., 94.) *

*Terrell & Walker*, for appellee.—* * * The original notes, it will be borne in mind, were filed as exhibits in the case, and, even if they were the best evidence, could never have been sent by permission of a court (not that in session) to North Carolina, in the hands of one pleading *non est factum* to them. No court would have permitted it. Why then go through the form of requiring the production, a thousand miles away, of an instrument not under the control of either party, before we could use its exact image? * * *

No two signatures made with a pen were ever exactly alike; and yet, while we permit experts to swear from points of resemblance, under some circumstances, to the common origin of signatures, we are asked to exclude as secondary evidence an achievement of science, which reproduces, with exact and mathematical accuracy, the lines of the very signatures in dispute, with all the relations of their lines to each other.

As late as 1874, Lord Coleridge, the chief justice of the Court of Common Pleas of England, in answer to an application to withdraw documents of the court, to be sent out to Bombay, to have identified the handwriting of some of them, said: "That difficulty might be got over by taking photographic copies, a thing by no means uncommon in the present day." (*Re* Stephens, 8 Moak, 482.)

---

*Their brief contained an able and exhaustive argument on the facts.

The very question we are discussing was thus decided as a matter of course, and without giving reasons for it.

The same thing was done, as stated in our former brief, in the Tichborne case.

In the case of Udderzook, Chief Justice Agnew, of the Supreme Court of Pennsylvania, delivering the opinion of the court, held that the photographic likeness was admissible, in a murder case, to prove the identity of the deceased, without producing the artist, to show that it was correctly taken; and the man was hung. Why not? That court was charged with judicial knowledge of matters of science, and they knew, without being told, that a photographic copy reproduced the exact and unmistakable likeness (save in color) of an object set before it.

The American Law Review, referring to the Udderzook case, in the very year (1874) in which Lord Coleridge held that a photograph might be sent to Bombay to prove hand-writing when the original was on file, used this language : "It came to this, whether the court would take judicial cognizance of photographs, as an established means of producing a correct likeness; this the court could not refuse to do. Its common use, the length of time the process has been known, the scientific principles on which it is based, all combine to make any other decision impossible."

In Leathers *v.* The Salver Wrecking Company, (2 Wood, 682,) decided in 1875, Judge Bradley decided that photographic copies of papers deposited in a public department could be read after "an authentication of their genuineness in the usual way, by proof of handwriting." What does this mean ? The copies were not authenticated properly under the act of Congress; objection was, therefore, made to their being read, and it was said that being a photograph it was "duplicate original," and, even without the proper certificate required by law, might be read as an original, by proving the handwriting of the photograph, and thus, in the usual way, prove handwriting.

Until photography was discovered, nothing in nature was exactly like any other thing, except that thing's image reflected in a polished surface, which disappeared when the object was removed. Until this discovery, there was, therefore, reason in the rule which required the production of the original paper writing as the best evidence of its appearance. Science now steps forward and relieves the difficulty, by making permanent, and materializing with minute exactness the reflected image. What reason thus remains why a discovery, which destroys the foundation for a rule, should not be used as proposed in the ascertainment of right?

Every object seen with the natural eye is only seen because photographed on the retina. In life the impression is transitory; it is only when death is at hand that it remains permanently fixed on the retina. Thus we are secure in asserting that no witness ever swore to a thing seen by him, without swearing from a photograph. What we call sight is but the impression made on the mind through the retina of the eye, which is nature's camera. Science has discovered that a perfect photograph of an object, reflected in the eye of one dying, remains fixed on the retina after death. (See recent experiments stated by Dr. Vogel in the May number, 1877, of Philadelphia Photographic Journal.) Take the case of a murder committed on the highway: on the eye of the victim is fixed the perfect likeness of a human face. Would this court exclude the knowledge of that fact from the jury, on the trial of the man against whom the glazed eye of the murdered man thus bore testimony? In other words, would a living eye-witness, whose memory only preserved the fleeting photograph of the deed, be heard, and the permanent photograph on the dead man's eye be excluded? We submit that the eye of the dead man would furnish the best evidence that the accused was there when the deed was committed, for it would bear a fact, needing no effect of memory to preserve it. It would not be parol evidence based

on uncertain memory, but the handwriting of nature, pre-. served by nature's camera.

If photographic copies of a signature can only be used as secondary evidence, surely the Supreme Court of the United States was sadly at fault.

The case of Luco *et al. v.* The United States, (23 Howard, 515,) seems to our mind conclusive. An immense land grant was claimed by the appellant; the Government resisted the claim, and alleged a forgery of the signature of Pio Pico, the Governor, to the grant. The grant was produced in court; witnesses were examined *pro* and *con*, as to the signatures and the seal. From among the Government archives were selected all the signatures of Pio Pico, which occurred during the month in which the grant bore date, and upon the same sheet (p. 530) was photographed the signatures of the grant, the original of which was also before the court. (P. 519.) These photographs went up with the record, and the Supreme Court of the United States, referring to them, said: "We have ourselves been able to compare these signatures, (photograph,) and fully concur (from evidence *oculis subjecta fidelibus*) that the signature and seal of Pico on this instrument are forgeries." (Id., 540.) Now, with the record disclosing that the original was before the lower court, and not sent up with the record, is it not strange that so august a court would have based their opinion on secondary evidence that the grant was a forgery, and called it evidence "*oculis subjecta fidelibus;*" and that, too, in the face of the fact that Pico himself had sworn (p. 541) to his belief that he extended the title?

Suppose that it can be shown that the erasure of writing on a raised check is made more manifest on a photographic copy: on a question involving the fraud, would not the photograph, instead of being secondary, become the best evidence? Now, any scientific photographer will verify the assertion. that where writing has been erased by chemical action, so that it is barely perceptible, if at all, to the naked eye, it

sometimes becomes visible in the photograph of the instrument.

A strict adherence to inflexible rules during an era of universal progress, when the reasons for their adoption have ceased, is injurious to every interest affected by them, and tends to impair that respect which law should receive. The rules of the common law are never inflexible; they advance with the progress of man, and harmonize with each change of his condition. Having their origin, not in statute law, but in reason, they observe its dictates. Growing up from man's just necessities, they keep step with enlightened progress, and adapt themselves to every discovery which improves his condition. A moment's reflection must convince us that this is true. Fifty years ago, before we had learned to make contracts by electricity, where could have been found the doctrine that a man in New York could in the same hour conceive and execute a contract, having the binding force of an instrument under seal, with another who in that same hour was in New Orleans? The then recognized laws of nature rendered the act impossible. But when science enabled us to write by electricity, the simple act of directing an agent to touch an ivory key and communicate one's idea might bind him, as by a contract under seal, to do or not to do the thing proposed to another, across the continent, whose face he had never seen. No statute has worked this change in the law of contracts; it grew out of the flexible character of the common law, which adapts itself to new conditions of our being resulting from new conquests of science.

*Charles I. Evans,* also for appellee.—As to the question of trust raised by counsel for appellant, the rule seems to be clearly defined and well established. All the authorities agree in the general rule, that statutes of limitation are equally obligatory in equity as in law. (2 Story's Eq. Jur., 1520; Jones *v.* Turberville, 2 Ves. Jr., 12; Hercy *v.* Dinwoody, Id., 87; Angell on Lim., secs. 25–30; Farnam *v.*

Brooks, 9 Pick., 213; Johnson *v.* Ames, 11 Id., 182; Tinnen *v.* Mebane, 10 Tex., 256; Leavitt *v.* Gooch, 12 Id., 95; Moore *v.* Hillebrant, 14 Id., 312; Eccles *v.* Daniels, 16 Id., 140; Gibson *v.* Fifer, 21 Id., 264; Smith *v.* Fly, 24 Id., 352; Glasscock *v.* Nelson, 26 Id., 150.) Courts of equity, acting on their own inherent doctrine of discouraging antiquated demands, for the peace of society, independent of any legislative limitations, refuse to entertain attempts to establish a stale trust. (Piatt *v.* Vattier, 9 Pet., 415, and authorities there cited; Lupton *v.* Janney, 13 Id., 385.) The only exception to this rule is where the trust is clearly and indisputably established, and the facts have been fraudulently and successfully concealed by the trustee from the *cestui que trust,* so as to satisfactorily account for and excuse his delay. (Badger *v.* Badger, 2 Wall., 87; Ford *v.* Clements, 13 Tex., 592.) Mere ignorance, without fraud, does not avoid the bar of the statute. (Martin *v.* The Branch Bank, 31 Ala., 115.) And even if fraud ever prevents the running of the statute, it only operates until the fraud might have been discovered by reasonable diligence. (Smith *v.* Fly, 24 Tex., 345.)

There are, however, a certain class of trusts not included in the operation of the statute of limitations. Trusts intended by courts of equity not to be reached or affected by the statute, are those purely technical and continuing trusts which are not at all cognizable in courts of law, but fall within the proper, peculiar, and exclusive jurisdiction of courts of equity. (Kane *v.* Bloodgood, 7 Johns. Ch., 90, 114; Humbert *v.* Trinity Church, 24 Wend., 608; Hamilton *r.* Shepperd, 3 Murphey, (N. C.,) 115; Wingate *r.* Wingate, 11 Tex., 434; Phillips *v.* Holman, 26 Id., 276; Munson *v.* Hallowell, Id., 480; Angell on Lim., sec. 166.) These trusts, that are said not to be affected by the statute of limitations, are confined to direct trusts created by deed or will, or by appointment of law, such as executorships and administrations; but cases of constructive trusts, arising from partnerships, agencies, and the like, are held to be subject to the operation of the statute.

(Farnam *v.* Brooks, 9 Pick., 242, 243; Robinson *v.* Hook, 4 Mason, (U. S. C. C.,) 139; Lawson *v.* Badgett, 20 Ark., 195; Borden *v.* Peay, Id., 293; Lewis *v.* Coxe, 4 Ired. Eq., 198; Robinson *v.* Varnell, 16 Tex., 382.)

*N. G. Shelley* and *Peeler & Fisher*, in response.—\* \* \* We repeat the challange heretofore made, that no case can be produced in which the testimony of witnesses, based solely on photographic copies, as in the case at bar, has been held admissible. In the case of Tome *v.* Parkersburg Railroad Co., 39 Md., 93, it was held that photographic copies were inadmissible when the genuineness of handwriting was in dispute. (See, also, *In re* Foster, decided by the Supreme Court of Michigan, and commented on in 3 Cen. Law Journal, 587.) In the last case, the court held photographic copies but secondary evidence, and of such an imperfect character as likely to mislead in cases of forgery. The case of *In re* Stephens, 8 Moak, 482, referred to by Messrs. Terrell & Walker, establishes nothing—Coleridge, chief justice, among others, made the suggestion referred to. The matter was not argued nor considered. It is in no sense a judgment.

In the Udderzook case, 76 Pa., 340, a photographic likeness was used to identify the deceased; but, even in that case, the court say, that the other facts and circumstances "leave no doubt of his identity as Goss, independently of the photograph."

In Leathers *v.* Salver Wrecking Co., 2 Woods, 682, the question was not as to the admissibility of photographic copies in a case of forgery or disputed handwriting; Judge Bradley simply held that they might be used as secondary evidence, where the originals were public documents in the department at Washington, and could not be withdrawn. The truth is, there is no law allowing the use of photographic copies in a case like the one at bar.

GOULD, ASSOCIATE JUSTICE.—In October, 1871, William

Eborn of North Carolina presented to Zimpelman, the administrator of the estate of his brother, Thomas Eborn, (who at the time of his death, early in 1871, was, and for many years had been, a citizen of Austin, Texas,) a claim duly authenticated, on the following instruments:

"Borrowed and received from William Eborn nine hundred dollars, which I promise to return when called for, with interest.

" *February* 3, 1846.

" (Signed)          THOS. EBORN."

" Received of William Eborn six thousand five hundred dollars, which I promise to invest in lands, or return the same when called for, with interest.

" *May* 14, 1846.

" (Signed)          THOS. EBORN."

The affidavit authenticating these instruments also claimed the further sum of $400, with interest thereon, from April 20, 1846, for which, it was stated, Thomas Eborn had also given a note similar in terms to the instruments set out, but which had been lost. Zimpelman, the administrator, rejected the claim on the ground that it was barred by the statute of limitations; and this suit was brought to have the claim established.

The petition alleges that in 1846, when Thomas Eborn was desirous of removing from North Carolina to the West, the petitioner advanced him the sums of money specified in the claim, on the understanding that Thomas would invest in lands for petitioner, and, in default of doing so, return the same, with interest thereon, when called for; and that "soon after the receipt of the last-mentioned sum, the said Thomas Eborn left the State of North Carolina, and was not heard from thereafter by any of his relatives or friends until some time in the early part of the year 1870, when petitioner received a letter" from Thomas requesting him to come to Austin, Texas. In an amended petition, besides claiming

that the instruments sued on established a trust, that on failure to invest in lands the money was due on demand, and that demand could not be made because plaintiff did not know where his brother was until about one year before his death, it was further alleged that on the 1st day of January, 1871, Thomas Eborn acknowledged in writing his obligation to pay plaintiff the money, and promised to pay the same. The letter which was offered in evidence under the last allegation is as follows:

        "Austin, *Janaury* 1, 1871.

"Dear Brother: I am bad off, and want you to come to Austin city right away and take charge. I have got property in Austin to pay you for the money you let me have, and the money uncle Tom paid me for you. Come at once; don't put it off. Have been looking for you some time. At my death all I have is yours.

      "(Signed)   Thomas Eborn."

The original answer of the administrator set up the defense of limitations, and also contained a plea of *non est factum,* signed by the attorney for the administrator, and verified by the affidavit of one Lawrence, claiming to be the " agent of the parties interested in the estate." A general exception to this plea of *non est factum* was sustained. Afterwards one McGilbry Barrow petitioned the court to be permitted to defend the suit as codefendant with the administrator, representing that he was brother of the half-blood and interested in the estate as heir; and was permitted by the court to file another plea of *non est factum,* embracing also the letter of January 1st, 1871, in which plea it was alleged that the instruments and letter were all in the handwriting of William Eborn. The plaintiff excepted to this action of the court, and to this last plea of *non est factum.* On the trial the court instructed the jury that the defense of limitations must prevail unless the debt had been acknowledged, and that if they found that the letter of January 1st, 1871, was

not genuine, they need inquire no further. If, however, they found that letter to be genuine, they were further to pass upon the genuineness of the original instruments of 1846.

The verdict of the jury was for the defendant, and they further found "that the letter dated January 1, 1871, was not written and signed by Thomas Eborn."

His motion for new trial being overruled, the plaintiff appealed, and his assignments of error and bills of exceptions present quite a number of questions, which will be considered without reference to the order in which they have been assigned and argued.

1. The claim as presented was a moneyed demand, barred upon its face. The nine hundred dollars borrowed to be returned "when called for," "created a cause of action from its date, and against it the statute runs from that time." (Cook *v.* Cook; 19 Tex., 436.) The receipt, or second instrument, is like the receipt which was before the court in Mitchell *v.* McLemore, 9 Tex., 151. In that case the receipt was for money to be invested in paying Government fees for Texas scrip, placed in the party's hands for location, and it was held that if, after the lapse of a reasonable time, the agent had failed to apply the money as required, he was in default, and the statute commenced to run without demand. It was held, further, that even if a demand was necessary, "the plaintiff should have made it within time to have brought his suit before the statute had interposed a bar from the time the default occurred."

After the lapse of a reasonable time to invest in lands, the money became due without demand; and even if demand were necessary, four years, the ordinary period of limitation to suits on written instruments, was long enough to allow for its being made. Regarding Mitchell *v.* McLemore as a case in point, and following that case and Wingate *v.* Wingate, 11 Tex., 430, we hold that the claim as presented, and as sued on, was not an express trust, but was an ordinary moneyed

demand, barred by limitation, unless there was a sufficient acknowledgment to support the action.

The averments of the petition, that Thomas Eborn left soon after receiving the last sum of money named, and that his whereabouts were not known until 1870, were not sufficient to make out such a case of fraud as constitutes an exception to the statute of limitations. There is no express charge of fraud, nor is it alleged that any efforts were made to ascertain his whereabouts, nor is it shown that such efforts would have been unavailing.

In the case of Munson *v.* Hallowell, the doctrine that the fraudulent concealment of the existence of a cause of action would prevent the running of the statute, was applied to the fraudulent removal and concealment of the subject-matter of litigation; but we are aware of no decision that the mere removal of the debtor without communicating to his creditor his new domicile, amounts to such a fraud as will stop the statute. The statutes of limitation of this State apply "no less to a foreign than to a domestic claim," and provide that "no demand against any person who shall hereafter remove to this State, shall be barred by the statute of limitations of this State, until he shall have resided in this State for the space of twelve months." (Paschal's Dig., arts. 4619, 4620.) This is the provision which the law makes for the benefit of the creditor in case of the removal of his debtor here from another State, and it is reasonable to assume that no further provision was deemed necessary or intended. (See Hunt *v.* Ellison, 32 Ala., 173; Howell *v.* Hair, 15 Ala., 194.) The court did not err, then, in instructing the jury that if they found against the genuineness of the letter of January 1, 1871, they need inquire no further.

There was much and conflicting evidence as to the genuineness of this letter, and the other instruments sued on, and it is claimed that the court erred in excluding evidence offered by plaintiff, and in the admission of evidence offered by defendant.

2. It appears by bill of exceptions that the plaintiff offered to submit in evidence sundry paper writings, purporting to be signed by Thomas Eborn, which had been testified to by competent witnesses as being, in their opinion, in the handwriting of Thomas Eborn, that the jury might examine and compare the writings with the papers on which the suit is based; which evidence was, on objection, excluded. The authorities cited by appellant do not maintain the admissibility, for such a purpose, of writings established only by the opinion of witnesses, or of any writings, unless "found to be genuine," or "established by the most satisfactory evidence." (Travis *v.* Brown, 43 Pa. St., 9; Lyon *v.* Lyman, 9 Conn., 55; Myers *v.* Toscan, 3 N. H., 47; Richardson *v.* Newcomb, 21 Pick., 315.)

In Commonwealth *v.* Eastman, 1 Cush., 217, the court say: "Nor can a paper proposed to be used as a standard be proved to be an original and a genuine signature, merely by the opinion of a witness that it is so; such opinion being derived solely from his general knowledge of the handwriting of the person whose signature it purported to be. The evidence resulting from a comparison of the disputed signature with other proved signatures is not regarded as evidence of the most satisfactory character, and by some most respectable tribunals is entirely rejected. In this commonwealth it is competent evidence; but the handwriting used as a standard must first be established by clear and undoubted proof; that is, either by direct evidence of the signature, or by some equivalent evidence;" citing Richardson *v.* Newcomb, *supra,* and Moody *v.* Rowell, 17 Pick., 490.)

Mr. Greenleaf favors the conclusion "that such papers can be offered in evidence only when no collateral issue can be raised concerning them; which (he says) is only when the papers are conceded to be genuine, or are such as the other party is estopped to deny; or are papers belonging to the witness who was himself previously acquainted with the party's handwriting, and who exhibits them in confirmation and ex-

planation of his testimony." (1 Greenl. Ev., sec. 581.) It is very clear that under these authorities the writings offered in evidence were not sufficiently established, and were properly excluded.

3. In the course of the trial the defendant introduced the depositions of sundry witnesses in the State of North Carolina, who testified that they knew the handwriting of William Eborn, but not that of Thomas Eborn. Attached to the interrogatories were photographic copies of the instruments charged to have been executed by Thomas Eborn in 1846, and these witnesses testified to their belief, that if the copies were exact, those instruments were in the handwriting of William Eborn. This evidence was objected to, but was admitted, and the question of its admissibility is fairly before us.

It was given in evidence by the artist who took the copies that, except as to color and size, they were exact reproductions of the originals, basing that statement, he says, upon the representations of scientific men as to the instruments with which they are taken, and his own observations.

In support of the admissibility of such evidence, it is contended that the court will take judicial notice that the photographic process secures a mathematically exact reproduction of the original, and that, therefore, evidence as to the handwriting of such a copy, is as satisfactory as though it referred to the original. But certainly the exactness of the photographic copy of a writing depends on the instrument and materials used. Like a letter-press copy, it is a copy, and may be more or less imperfect. However superior to other copies, it is certainly a question of fact whether any particular photographic copy is exact or not, for "photographers do not always produce exact *fac similes.*" "As a general rule, in proportion as the *media* of evidence are multiplied, the chances of error or mistake are increased." (Tome *v.* Parkersburg Branch R. R., 39 Md., 93.) Evidence as to the genuineness of a copy, however made, is, in its nature, less satisfactory than evidence as to the original. So it has been held

that letter-press copies were not admissible as competent standards of comparison. (Commonwealth v. Eastman, 1 Cushing, 217; Commonwealth v. Jeffries, 7 Allen, 561.) Where, however, the question is as to the genuineness of a letter which cannot, after due effort, be produced, the letter-press copy may retain enough of its original character to be identified by a witness, and, if so, the evidence is admissible as secondary evidence. (Commonwealth v. Jeffries, supra.) So, in Leathers v. Salvor Wrecking Co., 2 Woods, 682, where the originals were archives of the Government and could not be produced, Judge Bradley, speaking of photographic copies which were admitted, says: "No better evidence of their character and authenticity can be had than such a reproduction of them by the operation of natural agencies, and an authentication of their genuineness, in the usual way, by proof of handwriting."

The evidence was spoken of as other secondary evidence —admissible because no better could be had. Luco et al. v. U. S., 23 Howard, is another case, (referred to by counsel.) It would seem that here, also, the originals were public archives, which could not be produced, and this, perhaps, was the reason that photographic copies appear to have been used without objection. However that may be, the question of the admissibility of such evidence does not appear to have been either made, discussed, or decided.

Marcy v. Barnes, 16 Gray, 163, is a case where magnified copies of genuine signatures of the defendant, and of the disputed signature, were submitted to the inspection of the jury. This, the court say, "is not dissimilar to the examination with a magnifying glass," and is an additional and useful means of making comparisons between admitted signatures and one which is alleged to be only an imitation. So far from treating photographic copies as necessarily accurate, the court, in that case, expressly say, that their accuracy is a question of fact "to be considered and determined by the jury." Here, the enlarged photographic copies were used, it would

seem, not as substitutes, but in addition to the originals. Certainly, a photographic likeness of an individual may be used for the purpose of identification, where no better evidence is to be had, (see Udderzook v. Commonwealth, 76 Pa., 352,) but it would scarcely be contended that the testimony of a witness who had only seen the photograph would be as satisfactory as if he had known the original.

Our conclusion is that photographic copies of instruments sued on can only be used as secondary evidence; that in this case no proper foundation was laid for the introduction of secondary evidence, and that the depositions in regard to the photographic copies were improperly admitted. It does not appear that any effort was made to procure the leave of the court or the consent of the opposite party to use the originals, nor does it appear that it was impracticable to procure the attendance of the witnesses, so that they might examine the originals. The issue as to the genuineness of the writings was one made and to be tried in the District Court of Travis county, where those writings were on file. It seems that there were witnesses in North Carolina, whose testimony as to the handwriting was wanted, some by the plaintiff and some by the defendant. The former procured his witnesses to visit Austin. In one instance, at least, the latter did the same. If there were other witnesses for defendant, whose attendance was not procured, that was the misfortune of appellee, but did not authorize the course pursued. If photographic copies of writings may be made useful as affording increased facilities for obtaining the testimony of distant witnesses as to handwriting, our opinion is, that until the Legislature sees fit to authorize their use for such a purpose, under proper precautions, the courts can only allow it where better evidence is not to be had; and that the mere fact that the witness is a resident of another State, and the writings are on file in a court of this State, does not present such a case.

It is at least questionable whether witnesses who did not

know the handwriting of Thos. Eborn, should have been allowed to give their opinion that these instruments were in the handwriting of William Eborn. No authority has been cited for the admissibility of such evidence, and, in the absence of authority, it seems to us not within the rule which allows a witness who knows the handwriting of a party, to declare his belief as to the genuineness of an instrument purporting to be signed by him. Evidence that William Eborn, in fact, wrote the instruments, would clearly be competent, but it seems to us that to make the opinion or belief of witnesses not introduced as experts as to handwriting, admissible, they should know the handwriting of the purported signer of the instrument. For this additional reason, the evidence as to the photographic copies should have been excluded.

It thus appears that improper testimony was admitted; and, although that testimony was as to the genuineness of the instruments of 1846, and the case was disposed of (without passing upon that question) by finding that the letter of 1871 was not genuine, the two questions were so closely connected that we cannot say that this improper testimony did not operate to the prejudice of the plaintiff. If the jury believed that William Eborn, the plaintiff, forged the original obligations, they would require but little evidence to convince them that the letter was also a forgery. As we cannot say that the improper evidence did not operate to appellant's prejudice, this error entitles appellant to a reversal.

The question of the sufficiency of the plea of *non est factum* is one on which the two members of the court who sit in this case have only been able to agree in part. We are agreed, that section 195 of the Probate Law of 1870 referred to proceedings on the probate side of the court, and not to ordinary suits in the District Court. We are further agreed, that, under articles 35 and 1442, Paschal's Dig., the affidavit casting some suspicion on the instrument sued on, which

must accompany the plea of *non est factum* of an administration, may be made by the agent or attorney of the administrator.

In a case where the genuineness of a note is questioned by the heirs, and where, as appears from the evidence to be the fact in this case, the administrator believes it genuine, and therefore, it may be inferred, declines to make an affidavit casting suspicion upon it, he might still be willing that the question should be investigated, and to allow the heir to make such affidavit as would raise the issue. If it appeared affirmatively that the affidavit was made with the assent of the administrator, as his agent, we think the plea would have been sufficiently verified. If, however, the administrator does not assent, it would not seem to us that the heir could come into the suit as a co-defendant, and take the conduct of its defense out of the hands of the administrator.

As the case is to be reversed on other grounds, it is not necessary to decide whether, looking at the entire record, there was or was not error in the admission of the plea of *non est factum.*

The judgment is reversed and the cause remanded.

REVERSED AND REMANDED.

[Associate Justice MOORE did not sit in this case.]